## SCRANTON *v.* WHEELER.

ERROR TO THE SUPREME COURT OF THE STATE OF MICHIGAN.

No. 9.   Argued October 16, 1899.—Decided November 12, 1900.

The prohibition in the Constitution of the United States of the taking of private property for public use without just compensation has no application to the case of an owner of land bordering on a public navigable river, whose access from his land to navigability is permanently lost by reason of the construction, under authority of Congress, of a pier resting on submerged lands away from, but in front of his upland, and which pier was erected by the United States, not with any intent to impair the right of riparian owners, but for the purpose only of improving the navigation of such river.

It was not intended, by that provision in the Constitution, that the paramount authority of Congress to improve the navigation of the public waters of the United States should be crippled by compelling the Government to make compensation for an injury to a riparian owner's right of access to navigability that might incidentally result from an improvement ordered by Congress.

The state courts of Michigan having recognized this action as a proper one under the laws of that State for the relief sought by the plaintiff, this court has jurisdiction to consider the questions of a Federal nature decided herein.

This writ of error brings up for review a final judgment of the Supreme Court of Michigan holding that the United States is not required to compensate an owner of land fronting on a public navigable river when his right of access from the shore to the navigable part of such river is permanently obstructed by a pier erected in the river under the authority of Congress for the purpose only of improving navigation.

Omitting any reference to immaterial matters, the case as made by the pleadings and evidence is as follows:

By an act of Congress approved September 26, 1850, c. 71, providing for the examination and settlement of claims for land at the Sault Ste. Marie in Michigan, the local register and receiver of the land office were authorized to report upon claims to lots at that place under instructions to be given by the Commissioner of the General Land Office. 9 Stat. 469.

In conformity with proceedings under that act the heirs of Franklin Newcomb and Samuel Peck were confirmed in their claim jointly to premises known as Private Land Claim No. 3, and a patent was issued to them by the United States on the 6th day of October, 1874. The premises were at the west or upper end of the St. Mary's Falls Ship Canal, and one of the boundaries, as shown by the field notes, was "along the right bank of the Ste. Marie River." By mesne conveyances from the heirs of Franklin Newcomb the plaintiff, Scranton, became the owner of an undivided half of the land in question.

By an act approved August 26, 1852, c. 92, Congress granted to the State of Michigan the right to locate a canal through the public lands in that State known as the military reservation at the Falls of St. Mary's River, and four hundred feet of land in width extending along the line of the canal was granted for the construction and convenience of the canal and the appurtenances thereto, the use being vested in the State for such purposes and no other. The act provided that the canal should be located on the line of the survey made for that purpose or on such other route between the waters above and below the Falls as might be selected with the approval of the Secretary of War. In aid of the construction and completion of the canal Congress also granted to the State seven hundred and fifty thousand acres of public lands, and it was provided that the canal should be and remain a public highway for the use of the United States, free from toll or other charge upon the vessels of the Government engaged in the public service or upon vessels employed in the transportation of property or troops of the United States. 10 Stat. 35.

The construction of the canal was begun by Michigan in 1853 and completed in 1855. It was owned and operated by the State until the year 1881, when it was transferred to the United

States in conformity with the River and Harbor Act of June 14, 1880, c. 211, by which $250,000 was appropriated for improving. and operating the river and the canal, and by which also the Secretary of War was authorized to accept on behalf of the United States from the State of Michigan the St. Mary's Canal and the public works thereon—the transfer to be so made as to leave the United States free from all debts, claims or liability of any character whatsoever, and the canal after the transfer to be free for public use. By the same act the Secretary of War was authorized, such transfer being made, to draw from time to time his warrant on the Treasury to pay the actual expenses of operating and keeping the canal in repair. 21 Stat. 180, 189.

Prior to the transfer Congress had made large appropriations for the repair, preservation, improvement and completion of the canal. 16 Stat. 224, c. 240; 16 Stat. 402, c. 34; 18 Stat. 238, c. 457; 18 Stat. 456, c. 134; 19 Stat. 136, c. 267; 20 Stat. 156, c. 264; 20 Stat. 369, c. 181; 21 Stat. 189, c. 211.

As originally constructed, a pier extended from the west end of the canal into the water, curving to the north. This pier was opposite to a part of Private Land Claim No. 3, but left at that time a riparian frontage for those premises of from three to four hundred feet.

In 1877 the United States commenced and in 1881 completed the construction in the water of what is known as the New South Pier, which extended across the entire front of Private Land Claim No. 3 and was within the riparian ownership of the plaintiff as projected from the land towards the middle thread of the stream. The effect of the construction of this new pier was to exclude the plaintiff altogether from access from his land within the lateral lines of his riparian ownership, projected as aforesaid, to the navigable water or to the channel of the river that was navigable. On both sides of the space included within such projected lines of the plaintiff's riparian ownership and between the new pier and the bank of the river, the water was only five feet in depth; so that by reason of the construction and maintenance of the pier the plaintiff was prevented from reaching navigable water of greater depth than five feet.

The plaintiff desired to land freight on the New South Pier,

and thus convey it to the lot in question. But he was prevented from doing so by the defendant Wheeler, superintendent of the property, who was in possession of and exercised exclusive control over the canal and the pier as an officer or agent of the United States, and not otherwise.

No part of the pier in question in front of Private Land Claim No. 3 rests upon the fast land within that claim, but entirely upon submerged lands in front of or opposite to the fast land. The water between the pier and dry land is very shoal.

St. Mary's River forms a part of the boundary line between the United States and Canada, and where navigable forms, with the Great Lakes, a highway for interstate and international commerce. Near the point in question the river was not originally navigable, owing to the falls, and the canal was built around the falls to connect its navigable parts above and below, and was used in connection therewith for the purposes of such commerce.

The present action was brought by Scranton against Wheeler in the Circuit Court of Chippewa County, Michigan, the declaration alleging that the plaintiff was the owner in fee but was illegally deprived by the defendant of the possession of his interest in "Private Land Claim No. 3, Whelpley's survey, in the village of Sault Ste. Marie, Michigan, including therein that portion of the land beneath the water of St. Mary's River from the river bank on said lot to the thread of the stream of said river, which forms a part of said lot, and all riparian rights belonging and attaching thereto and being a part thereof;" which premises the plaintiff claimed in fee. The damages alleged were $35,000.

Upon the petition of Wheeler, the action was removed for trial into the Circuit Court of the United States on the ground that the Government of the United States was the real party in interest, and that the defence depended upon the construction of the laws of the United States. In that court there was a judgment in his favor. The case was then carried to the Circuit Court of Appeals, where the judgment was affirmed, an elaborate opinion being delivered by Judge Lurton. 16 U. S. App. 152; 57 Fed. Rep. 803. That court held: "That an officer of the

United States could be sued in ejectment by one claiming the title and the right of possession; that the case was properly removed to the Circuit Court for trial; that the Circuit Court of Appeals had jurisdiction under the act of March 3, 1891, c. 517, 26 Stat. 826, to review the judgment of the Circuit Court; and that as "an incident to ownership of lands on the margins of navigable streams, the law of Michigan attaches the legal title to the submerged lands under the stream comprehended within parallel lines extending perpendicular to the general trend of the shore along his land to the centre of the stream." After observing that although the plaintiff under the law of Michigan was seized of the legal title to the soil under the water, yet, in the very nature of the property, such seizure was of the bare technical title, the court proceeded: "It must, from these constitutional principles, follow that the State of Michigan held the soil beneath her navigable rivers under a high public trust, to forever preserve them free as public highways, subject only to the power of Congress to regulate commerce among the States. The legal title which, under her law, becomes vested in such proprietors, must be subject to the same public trusts, and therefore subordinate to the rights of navigation, and subordinate to the power of Congress to control and use the soil under such streams whenever the necessities of navigation and commerce should demand it. The right of Congress to regulate commerce, and, as an incident, navigation, remains unaffected by the question as to whether the title to the soil submerged is in the State or is in the owner of the shores. A distinction must be recognized between that which is *jus privatum* and that which is *jus publicum.* This private right is subordinate to the public right. The plaintiff holds the naked legal title, and with it he takes such proprietary rights as are consistent with the public right of navigation, and the control of Congress over that right. . . .
The significance of that case [ *Willson* v: *Marsh Co.,* 2 Pet. 245 ], as it affects this, was the refusal to enjoin the erection of the bridge on the complaint of one owning land on the shores above, whose access to and use of the stream was thereby injured. His property had not been taken. The injury to him was consequential, and he was held to be without remedy. Here the

plaintiff has sustained an injury which is wholly a consequence of the erection of a structure by Congress in aid of the general and public right of navigation. If Congress may lawfully use the soil as a support for such structures without acquiring the naked title outstanding in the plaintiff, then, for such injuries as are merely consequential, it is a case of damage without an actionable injury. A distinction exists between those cases where, under authority of the State, a structure has been placed in a navigable stream, such as a bridge, or lock and dam, as an improvement to the navigation of a stream wholly within its borders, and which is sought to be removed under the authority of subsequent Congressional legislation. In such case, the improvement, being by authority of law, can only be taken for public uses upon just compensation. This is the doctrine of the case of *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312. In that case it was held that not only must the actual property of the owner in the structure, but his franchise also, must be paid for. The plaintiff in the case before us has made no improvements for either public or private uses. No property of his has been invaded, none has been taken. The title in him was subject to the public uses. He held the soil under the river subservient to the purposes of navigation. The right to regulate commerce involved the right to regulate navigation, and this, in turn, involves the necessary uses of the submerged lands, in so far as such use was essential to the maintenance of the public highway. . . . The conclusion that we have reached is that there is no error in the judgment of the Circuit Court. The plaintiff has no such ownership of the *locus in quo* as makes its use for the purposes to which it has been devoted a taking of private property within the meaning of the Constitution."

Upon writ of error to this court the judgment of the Circuit Court of Appeals was reversed, upon the joint motion of the parties, with directions to remand the case to the state court for trial. The parties concurred in the opinion that the case was not removable from the state court — *Tennessee* v. *Union and Planters' Bank*, 152 U. S. 454, and *Chappell* v. *Waterworth*, 155 U. S. 102, being cited by them in support of that view.

At the trial in the state court the plaintiff asked the court to charge the jury —

That under the law of Michigan applicable to the facts in this case, the plaintiff was the owner of the submerged land in front of his upland, bounded by lines extending from the lateral lines of the upland to the centre file of the stream, and running at right angles with the course of the stream in front of the upland, and therefore that the land and property described in the declaration belonged to and was owned by the plaintiff in fee simple, and so belonged to him when the action was brought;

That the pier or structure in question was constructed and was maintained by the defendant across plaintiff's land without his consent and against his rights in the premises;

That neither the defendant nor the United States had any lawful right to construct the pier on and across the premises in question, thus taking possession of the premises adversely to the plaintiff and excluding him from enjoyment thereof, and from all access from his land and premises to the navigable water of the river in front thereof, and from the navigable water of the river to his land;

That neither the Government of the United States nor the defendant had any lawful right to so construct the pier or to maintain the same as was being done at the time suit was brought, and as they were now doing, without their first having acquired the right to so construct and maintain the same from the owner of the fee, or without obtaining the right therefor by proceedings under the power of eminent domain on payment of due compensation to the owner of the land therefor; and,

That under Article V of the Amendments to the Constitution of the United States the property in question could not lawfully be taken for the public use to which it was appropriated without just compensation having been made therefor to the owner or without due process of law.

The plaintiff also requested this instruction: "The construction of this pier was in violation, and the maintaining of the same was in violation of, said Article V of the Amendments to the Constitution of the United States in this, that it appears

from the testimony in the case that the same was appropriated without due process of law, and the same was taken and devoted to a public use without the consent of the owner thereof, and without just compensation therefor, and that the taking possession of the land of the plaintiff, as appears by the record, was in violation of said Article V; and that the taking possession of the land of the plaintiff and the construction of the pier thereon, in the manner shown in this case, the effect of which was to deprive him of all egress from his said land to the navigable water, the natural navigable water of the stream, and to prevent him using his said property by passing over or across said pier, as shown in the testimony of the case, was in violation of said Article V of the Amendments to the Constitution of the United States, and as depriving the owner thereof of his property without due process of law, and without just compensation, and without his consent."

These instructions were severally refused, and to that action of the court the plaintiff excepted.

In charging the jury the court stated that the United States District Attorney had suggested in writing that the property in controversy, the title and possession of which were the subjects of this litigation, was and for many years had been in the possession of the United States through its officers and agents; that it was held for public uses in connection with the commerce and navigation of the Great Lakes; that the nominal defendant had no personal interest in the matter; that his physical possession of the premises was in his official capacity and in law the possession of the United States; that the United States had always held title to the said land, and now holds possession under its claim of title; that this action was in effect an action against the United States Government, which in its sovereign capacity could not be sued; and for these reasons the District Attorney asked that all proceedings be stayed and the suit dismissed.

A verdict for the defendant was directed on the ground that, in legal effect, the action was against the United States and that a judgment for the plaintiff would be one against the Government and its property.

In the Supreme Court of the State the failure of the trial court to charge the jury as requested by the plaintiff, and the direction to the jury to return a verdict for the defendant, were assigned for error. That court, all the justices concurring, held that the action was not against the United States, but affirmed the judgment upon other grounds. It said : " When one in the actual possession of property defends his right of possession upon the ground that the Government, state or national, has placed him in possession, he must show that the right of the Government is paramount to the right of the plaintiff, or judgment will go against him. This point has been settled by the decision of the Supreme Court of the United States rendered May 10, 1897. *Tindal* v. *Wesley*, 167 U. S. 204. In that case the authorities upon this point are reviewed at length, including the case of *Stanley* v. *Schwalby*, 162 U. S. 255, upon which defendant mainly relies. The United States Government took possession of the submerged land of the plaintiff for the purpose of erecting thereon piers in aid of the immense navigation upon the Great Lakes and the rivers connecting them. That the improvements made were necessary to aid and protect this navigation is established beyond dispute. Had the Government the right to make these improvements upon the submerged land without compensation to the adjoining owner ? It is conceded that under the law of Michigan the title to submerged land is in the adjoining owner to the thread of the stream. It is insisted in behalf of the plaintiff that the Government possesses no right to so use his land, although submerged, and although necessary to so use it in aid of navigation, as to cut off his access to the open water. It is contended on the other hand that this title to submerged lands along navigable waters, and the right of access thereto, are subject to the paramount right of the United States to use this land in such manner as they shall determine to be necessary in aid of navigation. The Court of Appeals was unanimous in its opinion against the plaintiff's claim. In a very able opinion delivered by Judge Lurton the facts are clearly stated, the authorities cited, and we think the conclusion there reached is the correct one. We therefore deem it unnecessary for us to enter into a long dis-

cussion of the law and the authorities.　The case of *Hawkins Point Lighthouse*, 39 Fed. Rep. 77, appears to be exactly in point, and to rule the present case.　We think the conclusion reached by the court below was a correct one, although it gave a wrong reason."　113 Mich. 565.

The *Hawkins Point Lighthouse* case referred to in the opinion of the state court was ejectment brought in a Circuit Court of the United States against a government keeper of a lighthouse to recover possession of such house, erected in the Patapsco River, a public navigable water of the United States, by the Lighthouse Board in pursuance of acts of Congress.　There was no condemnation for public use of the lands upon which the lighthouse rested, nor was any compensation made to any one for the site.　The plaintiff was the owner of the upland, but had not, in the exercise of his riparian right, improved out into the water in front of his land.　The court, speaking by Judge Morris, held that the plaintiff was not entitled to recover, saying : "While the submerged land remains a part of the bed of the river it is not private property in the sense of the Fifth Amendment to the Federal Constitution.　As was declared in *Gilman* v. *Philadelphia*, 3 Wall. 725, the navigable waters ' are the public property of the nation, and subject to all the requisite legislation by Congress.'　In the hands of the State or of the state's grantee the bed of a navigable river remains subject to an easement of navigation, which the General Government can lawfully enforce, improve and protect.　It is by no means true that any dealing with a navigable stream which impairs the value of the rights of riparian owners gives them a claim for compensation.　The contrary doctrine, that, in order to develop the greatest public utility of a waterway, private convenience must often suffer without compensation, has been sanctioned by repeated decisions of the Supreme Court.　The following are cases all involving that proposition : *The Blackbird Creek Case*, 2 Pet. 245 ; *Gilman* v. *Philadelphia*, 3 Wall. 713 ; *Pound* v. *Turck*, 95 U. S. 459 ; *Wisconsin* v. *Duluth*, 96 U. S. 379 ; *South Carolina* v. *Georgia*, 93 U. S. 4.　If it were made apparent to Congress that any extension of the plaintiff's present shore line into the river tended to impair the navigability of

the stream or its use as a highway of commerce, Congress could authorize the agents of the United States to establish the present shore as the line beyond which no structures of any kind could be extended, and the plaintiff would have no claim for compensation. If the plaintiff could thus lawfully be prevented from appropriating to his private use any part of the submerged land lying in front of his shore line, and the whole of it be kept subservient to the easement of navigation, how can it be successfully claimed that he must be paid for the small portion covered by the lighthouse 200 feet from the shore, which has been taken for a use as strictly necessary to safe navigation as the improved channel itself? The Court of Appeals of Maryland, whenever called upon to declare the nature of the title of the State and its grantees in the land at the bottom of navigable streams, has uniformly held that the soil below high-water mark was as much a part of the *jus publicum* as the stream itself." 39 Fed. Rep. 77.

The plaintiff, Scranton, has assigned various grounds of error. These grounds are substantially those embodied in his requests for instructions in the trial court, and which were insisted upon in the Supreme Court of the State.

*Mr. John C. Donnelly* and *Mr. Harlow P. Davock* for plaintiff in error.

*Mr. Robert Howard* for defendant in error. *Mr. Solicitor General* was on his brief.

Mr. Justice Harlan delivered the opinion of the court. After stating the facts as above reported, he proceeded:

1. The Government insists that ejectment is not the proper remedy for a riparian owner to secure the removal of a structure that interferes with access by him from his fast land to navigable water. A sufficient answer to this objection is that the state court recognized the present action as a proper one under the laws of Michigan for the relief sought by the plaintiff. We have therefore to consider only the controlling questions of a

Federal nature presented by the record and decided by the state court.

2. The Supreme Court of the State correctly held that the trial court erred in directing a verdict for the defendant upon the ground that a judgment against him would in legal effect be a judgment against the United States.    It is true the defendant Wheeler insisted that the action of which the plaintiff complained was taken by him under the authority of the United States.    But this fact was not sufficient to defeat the suit.    If the plaintiff was entitled to access from his land to navigable water, and if the defendant stood in the way of his enjoying that right, then the court was under a duty to inquire whether the defendant had or could have any authority in law to do what he had done ; and the suit was not to be deemed one against the United States because in the consideration of that question it would become necessary to ascertain whether the defendant could constitutionally acquire from the United States authority to obstruct the plaintiff's access to navigable water in front of his land without making or securing compensation to him.    The issue, in point of law, was between the individual plaintiff and the individual defendant, and the United States not being a party of record a judgment against Wheeler will not prevent it from instituting a suit for the direct determination of its rights as against the plaintiff.    This subject has been examined by the court in numerous cases, the most recent one being *Tindal* v. *Wesley*, 167 U. S. 204, 222, 223.    In that case—which was a suit to recover real property in South Carolina held by the defendants, as they insisted, in their capacities as officers of the State and only for the State—it was said that " the Eleventh Amendment gives no immunity to officers or agents of a State in withholding the property of a citizen without authority of law.    And when such officers or agents assert that they are in rightful possession, they must make good that assertion when it is made to appear in a suit against them as individuals that the legal title and right of possession is in the plaintiff."    Again : " It is said that the judgment in this case may conclude the State.    Not so.    It is a judgment to the effect only that as between the plaintiff and the defendants, the former is entitled to

possession of the property in question, the latter having shown no valid authority to withhold possession from the plaintiff; that the assertion by the defendants of a right to remain in possession is without legal foundation. The State not being a party to the suit, the judgment will not conclude it. Not having submitted its rights to the determination of the court in this case, it will be open to the State to bring any action that may be appropriate to establish and protect whatever claim it has to the premises in dispute. Its claim, if it means to assert one, will thus be brought to the test of the law as administered by tribunals ordained to determine controverted rights of property ; and the record in this case will not be evidence against it for any purpose touching the merits of its claim."

These principles are applicable to the present case, and show that it is not within the rule forbidding a suit against the United States except with its consent.

3. The vital question therefore is the one heretofore mentioned, namely, whether the prohibition in the Constitution of the United States of the taking of private property for public use without just compensation has any application to the case of an owner of land bordering on a public navigable river whose access from his land to navigability is permanently lost by reason of the construction of a pier resting on submerged lands away from but in front of his upland, and which pier was erected by the United States not with any intent to impair the rights of riparian owners but for the purpose only of improving the navigation of such river.

Undoubtedly compensation must be made or secured to the owner when that which is done is to be regarded as a taking of private property for public use within the meaning of the Fifth Amendment of the Constitution ; and of course in its exercise of the power to regulate commerce, Congress may not override the provision that just compensation must be made when private property is taken for public use. What is private property within the meaning of that Amendment, or what is a taking of private property for public use, is not always easy to determine. No decision of this court has announced a rule that will embrace every case. But what has been said in some cases involving the

general question will assist us in determining whether the present plaintiff has been denied the protection secured by the constitutional provision in question.

In *Pumpelly* v. *Green Bay Company*, 13 Wall. 166, 181, the court construed a provision of the constitution of Wisconsin declaring that " the property of no person shall be taken for public use without just compensation therefor ; " observing that it was a provision almost identical in language with the one relating to the same subject in the Federal Constitution. In that case it appeared that a public improvement in a navigable water was made under local statutory authority, whereby the plaintiff's land was permanently overflowed and its use for every purpose destroyed. Referring to some adjudged cases which went, as the court observed, beyond sound principle, it was said that, " it remains true that where real estate is actually invaded by superinduced additions of water, earth, sand or other material, or by having any artificial structure placed on it, so as to effectually destroy or impair its usefulness, it is a taking, within the meaning of the Constitution, and that this proposition is not in conflict with the weight of judicial authority in this country, and certainly not with sound principle."

That case was relied upon in *Transportation Co.* v. *Chicago*, 99 U. S. 635, 642, as establishing the invalidity of certain municipal acts looking to the improvement of a public highway. But this court said that " acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though their consequences may impair its use, are universally held not to be a taking within the meaning of the constitutional provision. They do not entitle the owner of such property to compensation from the State or its agents, or give him any right of action. This is supported by an immense weight of authority." It was observed in the same case that the extremest qualification of the doctrine was that found in *Pumpelly's* case, and that case was referred to as holding nothing more than that " the permanent flooding of private property may be regarded as a ' taking,' " because there would be in such case " a physical invasion of the real estate of the owner, and a practical ouster of his possession."

In *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 341, 343, there was an actual taking of certain locks and dams which had been constructed and maintained, under competent authority, by a navigation company, and the question was whether the franchise to take tolls for the use of the locks was to be deemed a part of the property taken for which compensation must be made. This court held that it was, remarking: "The franchise is a vested right. The State has power to grant it. It may retake it, as it may take other private property, for public uses, upon the payment of just compensation. A like, though a superior, power exists in the National Government. It may take it for public purposes, and take it even against the will of the State; but it can no more take the franchise which the State has given than it can any private property belonging to an individual." Again, in the same case: "It is also suggested that the Government does not take this franchise; that it does not need any authority from the State for the exaction of tolls, if it desires to exact them; that it only appropriates the tangible property, and then either makes the use of it free to all, or exacts such tolls as it sees fit, or transfers the property to a new corporation of its own creation, with such a franchise to take tolls as it chooses to give. But this franchise goes with the property; and the Navigation Company, which owned it, is deprived of it. The Government takes it away from the company, whatever use it may make of it; and the question of just compensation is not determined by the value to the Government which takes, but the value to the individual from whom the property is taken; and when by the taking of the tangible property the owner is actually deprived of the franchise to collect tolls, just compensation requires payment, not merely of the value of the tangible property itself, but also of that of the franchise of which he is deprived."

But the case most analogous to the present one is that of *Gibson* v. *United States*, 166 U. S. 269, 271, 275, 276. That was an action in the Court of Claims to recover damages resulting from the construction of a dike by the United States in the Ohio River near the plaintiff's farm on Neville Island, a short distance below Pittsburg.

From the finding of facts in that case it appears that at the time the dike was constructed Mrs. Gibson's farm was in a high state of cultivation, with a frontage of 1000 feet on the main channel of the Ohio River, and had a landing that was used in shipping products from and in bringing supplies to it, and that there was no other landing on the farm which the owner could use in shipping products and in receiving supplies; that the dike was constructed under the authority of an act of Congress appropriating money for improving the Ohio River; that the owner was unable to use the landing for the shipment of products from and supplies to the farm for the greater part of the gardening season on account of the dike obstructing the passage of boats, and could only use the landing at a high stage of water; that after the dike was made she could not, during the ordinary stage of water, ship products from or receive supplies for her farm, without going over the farms of her neighbors to reach another landing; and that in consequence of the construction and maintenance of the dike the plaintiff's farm had been reduced in value from $600 to $150 or $200 per acre. It was further found that the plaintiff's access to the navigable part of the river was not entirely cut off; that at a nine-foot stage of water, which frequently occurred during November, December, March, April and May, she could get into her dock in any manner, while from a three-foot stage of water she could communicate with the navigable channel through a chute, and at any time haul out to the channel by wagon; that no water was thrown back on the land by the building of the dike; and that the dike itself did not come into physical contact with the land and was constructed in the exercise of a claimed right to improve the navigation of the river.

This court held that the plaintiff had no cause of action against the United States. It said: "All navigable waters are under the control of the United States for the purpose of regulating and improving navigation, and although the title to the shore and submerged soil is in the various States and individual owners under them, it is always subject to the servitude in respect of navigation created in favor of the Federal Government by the Constitution" — citing *South Carolina* v. *Georgia,*

93 U. S. 4; *Shively* v. *Bowlby*, 152 U. S. 1; *Eldridge* v. *Treze-vant*, 160 U. S. 452. Again, in the same case: "The Fifth Amendment to the Constitution of the United States provides that private property shall not 'be taken for public use without just compensation.' Here, however, the damage of which Mrs. Gibson complained was not the result of the taking of any part of her property, whether upland or submerged, or a direct invasion thereof, but the incidental consequence of the lawful and proper exercise of a governmental power." "Moreover," the court said, "riparian ownership is subject to the obligation to suffer the consequences of the improvement of navigation in the exercise of the dominant right of the Government in that regard. The legislative authority for these works consisted simply in an appropriation for their construction, but this was an assertion of a right belonging to the Government, to which riparian property was subject, and not of a right to appropriate private property, not burdened with such servitude, to public purposes."

In the light of these adjudications can it be held that Scranton, the plaintiff, is entitled, by reason of the construction of the pier in question, to compensation for the destruction of his right, as riparian owner, of access from his land to the navigable part of the river immediately in front of it?

It is said that he is so entitled in virtue of the decision in *Yates* v. *Milwaukee*, 10 Wall. 497, 504, 505. The report of that case shows that Yates owned a wharf on a navigable river within the limits of the city of Milwaukee and that the city by an ordinance declared the wharf to be a nuisance and ordered it to be abated. There was no proof whatever in the record that the wharf was in fact an obstruction to navigation or a nuisance except the declaration to that effect in the city ordinance; and Yates brought suit to enjoin interference with it by the city. This court held that the mere declaration by the city that Yates' wharf was a nuisance did not make it one, saying: "It is a doctrine not to be tolerated in this country that, a municipal corporation, without any general laws either of the city or of the State, within which a given structure can be shown to be a nuisance, can, by its mere declaration that it

is one, subject it to removal by any person supposed to be aggrieved, or even by the city itself." This, as this court said in *Shively* v. *Bowlby*, 152 U. S. 1, 40, was quite sufficient to dispose of the case in Yates' favor, and indicated the point adjudged. A proper disposition of the case required nothing more to be said. But the opinion of the court went further, and after observing, upon the authority of *Dutton* v. *Strong*, 1 Black, 23, and *Railroad Co.* v. *Schurmeir*, 7 Wall. 272, that a riparian owner is entitled to access to the navigable part of the river from the front of his lot, subject to such general rules and regulations as the legislature might prescribe for the protection of the rights of the public, said : " This riparian right is property, and is valuable, and though it must be enjoyed in due subjection to the rights of the public, it cannot be arbitrarily or capriciously destroyed or impaired. It is a right of which, when once vested, the owner can only be deprived in accordance with established law, and, if necessary that it be taken for the public good, upon due compensation."

The decision in *Yates* v. *Milwaukee* cannot be regarded as an adjudication upon the particular point involved in the present case. That, as we have seen, was a case in which the riparian owner had in conformity with law erected a wharf in front of his upland in order to have access to navigable water. The city of Milwaukee attempted arbitrarily and capriciously to destroy or remove the wharf that had lawfully come into existence and was not shown, in any appropriate mode, to have been an obstruction to navigation. It was a case in which a municipal corporation intended the actual destruction of tangible property belonging to a riparian owner and lawfully used by him in reaching navigable water, and not, like this, a case of the exercise in a proper manner of an admitted governmental power resulting indirectly or incidentally in the loss of the citizen's right of access to navigation—a right never exercised by him in the construction of a wharf before the improvement in question was made by the Government.

While the present case differs in its facts from any case heretofore decided by this court, it is embraced by principles of constitutional law that have become firmly established.

The Constitution invests Congress with the power to regulate commerce with foreign nations and among the several States. This power includes the power to prescribe " the rule by which commerce is to be governed;" "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution;" and "comprehends navigation within the limits of every State in the Union, so far as that navigation may be, in any manner, connected with ' commerce with foreign nations, or among the several States, or with the Indian tribes.'" *Gibbons* v. *Ogden,* 9 Wheat. 1, 196, 197.

In *Gilman* v. *Philadelphia,* 3 Wall. 713, 724, the court said : " Commerce includes navigation. The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States which are accessible from a State other than those in which they lie. For this purpose they are the public property of the nation, and subject to all the requisite legislation by Congress."

In *South Carolina* v. *Georgia,* 93 U. S. 4, 11, 12, the court said that Congress "may build lighthouses in the bed of the stream. It may construct jetties. It may require all navigators to pass along a prescribed channel, and may close any other channel to their passage."

In *Mobile County* v. *Kimball,* 102 U. S. 691, 696, the court, observing that the power of Congress to regulate commerce was without limitation, said : "It authorizes Congress to prescribe the conditions upon which commerce in all its forms shall be conducted between our citizens and the citizens or subjects of other countries and between the citizens of the several States, and to adopt measures to promote its growth and insure its safety. And as commerce embraces navigation, the improvement of harbors and bays along our coast, and of navigable rivers within the States connecting with them, falls within the power."

In *Stockton* v. *Baltimore & N. Y. Railroad,* 32 Fed. Rep. 9, 20, Mr. Justice Bradley, holding the Circuit Court, said : " Such being the character of the state's ownership of the land under water—an ownership held, not for the purpose of emolument,

but for public use, especially the public use of navigation and commerce—the question arises whether it is a kind of property susceptible of pecuniary compensation, within the meaning of the Constitution. The Fifth Amendment provides only that *private property* shall not be taken without compensation, making no reference to public property. But, if the phrase may have an application broad enough to include all property and ownership, the question would still arise whether the appropriation of a few square feet of the river bottom to the foundation of a bridge, which is to be used for the transportation of an extensive commerce in aid and relief of that afforded by the waterway, is at all a diversion of the property from its original public use. It is not so considered when sea walls, piers, wing-dams and other structures are erected for the purpose of aiding commerce by improving and preserving the navigation. Why should it be deemed such when (without injury to the navigation) erections are made for the purpose of aiding and enlarging commerce beyond the capacity of the navigable stream itself, and of all the navigable waters of the country? It is commerce, and not navigation, which is the great object of constitutional care. The power to regulate commerce is the basis of the power to regulate navigation and navigable waters and streams, and these are so completely subject to the control of Congress, as subsidiary to commerce, that it has become usual to call the entire navigable waters of the country the navigable waters of the United States. It matters little whether the United States had or has not the theoretical ownership and dominion in the waters, or the land under them; it has, what is more, the regulation and control of them for the purposes of commerce. So wide and extensive is the operation of this power that no State can place any obstruction in or upon any navigable waters against the will of Congress, and Congress may summarily remove such obstructions at its pleasure. And all this power is derived from the power 'to regulate commerce.' Is this power stayed when it comes to the question of erecting a bridge for the purposes of commerce across a navigable stream? We think not. We think that the power to regulate commerce between the States extends, not only to the control of the naviga-

ble waters of the country, and the lands under them, for the purposes of navigation, but for the purpose of erecting piers, bridges and all other instrumentalities of commerce which, in the judgment of Congress, may be necessary or expedient."

As much was said in argument about the decisions in New York it may be well here to refer to some of the rulings of the highest court of that State. In *Rumsey et al.* v. *New York and New England Railroad Co.*, 133 N. Y. 79, 85, 89, the Court of Appeals of New York, referring to the prior case of *Gould* v. *Hudson River Railroad Co.*, 6 N. Y. 522, said : "It was there held that the owner of lands on the Hudson River has no private right or property in the waters or the shore between high and low-water mark, and, therefore, is not entitled to compensation from a railroad company which, in pursuance of a grant from the legislature, constructs a railroad along the shore, between high and low-water mark, so as to cut off all communications between the land and the river otherwise than across the railroad. It is believed that this proposition is not supported by any other judicial decision in this State, and if we were dealing with the question now as an original one, it would not be difficult to show that the judgment in that case was a departure from precedent and contrary to reason and justice." Again, in the same case : "It must now, we think, be regarded as the law in this State that an owner of land on a public river is entitled to such damages as he may have sustained against a railroad company that constructs its road across his water front and deprives him of access to the navigable part of the stream, unless the owner has granted the right, or it has been obtained by the power of eminent domain. This principle cannot, of course, be extended so as to interfere with the right of the State to improve the navigation of the river, or with the power of Congress to regulate commerce under the provisions of the Federal Constitution."

But in a later case in New York relating to this subject— *Sage* v. *The Mayor*, 154 N. Y. 61, 69—the Court of Appeals, after observing that the court in *Rumsey et al.* v. *New York and New England Railroad Co.* had been careful to say that the principle announced by it was not to be extended so as to

interfere with the right of the State to improve the navigation of the river, or with the power of Congress to regulate commerce under the provisions of the Federal Constitution, said: " While we think it is a logical deduction from the decisions in this State that, as against the general public, through their official representatives, riparian owners have no right to prevent important public improvements upon tidewater for the benefit of commerce, the principle upon which the rule rests, although sometimes foreshadowed, has not been clearly set forth. Although, as against individuals or the unorganized public, riparian owners have special rights to the tideway that are recognized and protected by law, as against the general public, as organized and represented by government, they have no rights that do not yield to commercial necessities, except the right of preëmption, when conferred by statute, and the right to wharfage, when protected by a grant and covenant on the part of the State, as in the *Langdon* [93 N. Y. 129] and *Williams* [105 N. Y. 419] cases. I think that the rule rests upon the principle of implied reservation, and that in every grant of lands bounded by navigable waters where the tide ebbs and flows, made by the crown or the State as trustee for the public, there is reserved by implication the right to so improve the water front as to aid navigation for the benefit of the general public, without compensation to the riparian owner. The implication springs from the title to the tideway, the nature of the subject of the grant and its relation to navigable tidewater, which has been aptly called the highway of the world. The common law recognizes navigation as an interest of paramount importance to the public."

All the cases concur in holding that the power of Congress to regulate commerce, and therefore navigation, is paramount, and is unrestricted except by the limitations upon its authority by the Constitution. Of course, every part of the Constitution is as binding upon Congress as upon the people. The guarantees prescribed by it for the security of private property must be respected by all. But whether navigation upon waters over which Congress may exert its authority requires improvement at all, or improvement in a particular way, are matters wholly

within its discretion; and the judiciary is without power to control or defeat the will of Congress, so long as that branch of the Government does not transcend the limits established by the supreme law of the land. Is the broad power with which Congress is invested burdened with the condition that a riparian owner whose land borders upon a navigable water of the United States shall be compensated for his right of access to navigability whenever such right ceases to be of value solely in consequence of the improvement of navigation by means of piers resting upon submerged lands away from the shore line? We think not. The question before us does not depend upon the inquiry whether the title to the submerged lands on which the New South Pier rests is in the State or in the riparian owner. It is the settled rule in Michigan that " the title of the riparian owner extends to the middle line of the lake or stream of the inland waters." *Webber* v. *The Pere Marquette Boom Co.*, 62 Mich. 626, and authorities there cited. But it is equally well settled in that State that the rights of the riparian owner are subject to the public easement or servitude of navigation. *Lorman* v. *Benson*, 8 Mich. 18, 32; *Ryan* v. *Brown*, 18 Mich. 196, 207. So that whether the title to the submerged lands of navigable waters is in the State or in the riparian owners, it was acquired subject to the rights which the public have in the navigation of such waters. The primary use of the waters and the lands under them is for purposes of navigation, and the erection of piers in them to improve navigation for the public is entirely consistent with such use, and infringes no right of the riparian owner. Whatever the nature of the interest of a riparian owner in the submerged lands in front of his upland bordering on a public navigable water, his title is not as full and complete as his title to fast land which has no direct connection with the navigation of such water. It is a qualified title, a bare technical title, not at his absolute disposal, as is his upland, but to be held at all times subordinate to such use of the submerged lands and of the waters flowing over them as may be consistent with or demanded by the public right of navigation. In *Lorman* v. *Benson*, above cited, the Supreme Court of Michigan, speaking by Justice Campbell, declared the right of navigation to be one

to which all others were subservient.  The learned counsel for the plaintiff frankly states that compensation cannot be demanded for the *appropriation* of the submerged lands in question and that the United States under the power to regulate commerce has an unquestioned right to *occupy* them for a lawful purpose and in a lawful manner.  This must be so—certainly in every case where the use of the submerged lands is necessary or appropriate in improving navigation.  But the contention is that compensation must be made for the loss of the plaintiff's access from his upland to navigability incidentally resulting from the occupancy of the submerged lands, even if the construction and maintenance of a pier resting upon them be necessary or valuable in the proper improvement of navigation.  We cannot assent to this view.  If the riparian owner cannot enjoy access to navigability because of the improvement of navigation by the construction away from the shore line of works in a public navigable river or water, and if such right of access ceases alone for that reason to be of value, there is not, within the meaning of the Constitution, a *taking* of *private* property for public use, but only a consequential injury to a right which must be enjoyed, as was said in the *Yates* case, " in due subjection to the rights of the public "—an injury resulting incidentally from the exercise of a governmental power for the benefit of the general public, and from which no duty arises to make or secure compensation to the riparian owner.  The riparian owner acquired the right of access to navigability subject to the contingency that such right might become valueless in consequence of the erection under competent authority of structures on the submerged lands in front of his property for the purpose of improving navigation.  When erecting the pier in question, the Government had no object in view except, in the interest of the public, to improve navigation.  It was not designed arbitrarily or capriciously to destroy rights belonging to any riparian owner.  What was done was manifestly necessary to meet the demands of international and interstate commerce.  In our opinion, it was not intended that the paramount authority of Congress to improve the navigation of the public navigable waters of the United States should be crippled by

compelling the Government to make compensation for the injury to a riparian owner's right of access to navigability that might incidentally result from an improvement ordered by Congress. The subject with which Congress dealt was navigation. That which was sought to be accomplished was simply to improve navigation on the waters in question so as to meet the wants of the vast commerce passing and to pass over them. Consequently the agents designated to perform the work ordered or authorized by Congress had the right to proceed in all proper ways without taking into account the injury that might possibly or indirectly result from such work to the right of access by riparian owners to navigability.

It follows from what has been said that the pier in question was the property of the United States, and that when the defendant refused to plaintiff the privilege of using it as a wharf or landing place he violated no right secured to the latter by the Constitution.

We are of opinion that the court below correctly held that the plaintiff had no such right of property in the submerged lands on which the pier in question rests as entitles him, under the Constitution, to be compensated for any loss of access from his upland to navigability resulting from the erection and maintenance of such pier by the United States in order to improve and which manifestly did improve the navigation of a public navigable water.

The judgment of the Supreme Court of Michigan is therefore
*Affirmed.*

MR. JUSTICE BREWER concurred in the result.

MR. JUSTICE SHIRAS, with whom concurred MR. JUSTICE GRAY and MR. JUSTICE PECKHAM, dissenting.

Gilmore G. Scranton, the plaintiff in error, derived his title to a tract of land, known as Private Land Claim No. 3, and fronting on the St. Mary's River, a stream naturally navigable, under a patent of the United States granted on October 6, 1874. It must be regarded as the settled law of this court that grants

by Congress of portions of the public lands, bordering on or bounded by navigable waters, convey, of their own force, no title or right below high-water mark, but leave the question of the use of the shores by the owners of uplands to the sovereign control of each State, subject only to the rights vested by the Constitution of the United States.

In *Shively* v. *Bowlby*, 152 U. S. 1, there was a controversy between parties claiming under a patent of the United States for a donation land claim bounded by the Columbia River, and parties claiming under deeds from the State of Oregon for lands between the lines of low and ordinary high tide of the Columbia River. It was held by the Supreme Court of Oregon, 22 Oregon, 427, that the lands in question, lying between the uplands and the navigable channel of the Columbia River, belonged to the State of Oregon, and that its deed to such lands conveyed a valid title.

The case was brought to this court, where the judgment of the Supreme Court of Oregon was affirmed. The opinion of this court contains an elaborate review of the English authorities expounding the common law, of decisions of the several States, and of the previous decisions of this court. The conclusion reached was that the title and rights of riparian or littoral proprietors in the soil below high-water mark are governed by the local laws of the several States, subject, of course, to the rights granted to the United States by the Constitution. The theory on which Congress has acted in this matter was thus stated by the court:

" The Congress of the United States, in disposing of the public lands, has constantly acted upon the theory that those lands, whether in the interior, or on the coast, above high-water mark, may be taken up by actual occupants, in order to encourage the settlement of the country; but that the navigable waters and the soils under them, whether within or above the ebb and flow of the tide, shall be and remain public highways; and, being chiefly valuable for the public purposes of commerce, navigation and fishery, and for the improvements necessary to secure and promote those purposes, shall not be granted away during the period of territorial government; but, unless in case

of some international duty· or public exigency, shall be held by
the United States in trust for the future States, and shall vest
in the several States, when organized and admitted into the
Union, with all the powers and prerogatives appertaining to
the older States in regard to such waters and soils within their
respective jurisdictions; in short, shall not' be disposed of piece-
meal to individuals as private property, but shall be held as a
whole for the purpose of being ultimately administered and
dealt with for the public benefit by the State, after it shall have
become a completely organized community."

The reasoning and conclusions of this case were followed and
applied in the subsequent cases of *Mann* v. *Tacoma Land Co.,*
153 U. S. 273; *St. Anthony Falls Water Power Co.* v. *St. Paul
Water Commissioners,* 168 U. S. 349; and *Morris* v. *United
States,* 174 U. S. 196.

It cannot be said that any title to the submerged land be-
came vested in the plaintiff in error, as against the State or its
grantees, by reason of the fact that it is the law in Michigan,
in the case of lands abutting on navigable streams, titles to
which are derived from the State, that such titles extend to and
embrace submerged lands as far as the thread of the stream.
It has never been held in Michigan that that doctrine applied
to the case of titles derived from the United States.

*Shively* v. *Bowlby,* and *Mann* v. *Tacoma Land Company,*
above cited, were both cases in which it was held that titles de-
rived under grants by the United States to lands abutting on
navigable waters did not avail as against the State and subse-
quent grantees.

It is not pretended that the State of Michigan ever made any
grant of these submerged lands to the plaintiff in error; but,
on the contrary, the State in 1881, transferred all its rights in
the St. Mary's Canal and the public works thereon, with all its
appurtenances, to the United States.   Howell's Stat. sec. 5502.

This would seem to dispose of the claim to the land occupied
by the pier in the river in front of Private Land Claim No. 3.
And, indeed, the counsel for the plaintiff in error, in their briefs
filed of record in this court, conceded that, under the facts of
this case, compensation could not be demanded for the appro-

priation of the submerged lands, and restricted their argument to the question of the plaintiff's right of access to the navigable stream bounding his property. But the opinion in this case, while correctly stating that the question before us is as to the right of the plaintiff in error to be indemnified for the total destruction of his access to the river, does not confine the discussion to that question. Not regarding the fact that the plaintiff in error has failed to show any title to the submerged land, and that no such claim is urged on his behalf in this court, it is said in the opinion that—

"The question before us does not depend upon the inquiry whether the title to the submerged lands on which the New South Pier rests is in the State or in the riparian owner. It is the settled rule in Michigan that 'the title of the riparian owner extends to the middle line of the lake or stream of the inland waters.' *Webber* v. *Pere Marquette Boom Co.*, 62 Mich. 636, and authorities there cited. But it is equally well settled in that State that the rights of the riparian owner are subject to the public easement or servitude of navigation. *Lowman* v. *Benson*, 8 Mich. 18; *Ryan* v. *Brown*, 18 Mich. 195.

"So that whether the title to the submerged lands of navigable waters is in the State or in the riparian owners, such title was taken subject to the rights which the public have in the navigation of the waters in question. The primary use of the waters and the lands under them is for purposes of navigation, and the erection of piers in them to improve navigation for the public is strictly consistent with such use, and infringes no right of the riparian owner. Whatever the interest of a riparian owner in the submerged lands in front of his upland, his title is not as full and complete as his title acquired to fast land which has no direct connection with the navigation of the river or water on which it borders. It is not a title at his absolute disposal, but is to be held at all times subordinate to such use of the submerged lands and of the waters flowing over them as is consistent with or demanded by the public right of navigation. The learned counsel for the plaintiff frankly states that compensation cannot be demanded for the appropriation of the submerged lands in question, and that the United States, under the

power to regulate commerce, has an unquestioned right to occupy them for a lawful purpose and in a lawful manner. This must be so—certainly in every case where the use of the submerged lands is necessary for the improvement of navigation."

It is, I think, impossible to read this language, particularly when read in connection with other passages in the opinion, without understanding it to assert that where the riparian owner has a title to lands under navigable waters adjacent to his upland, such land may be taken into the exclusive possession of the Government by the erection of a public work without compensation; and that, even if the state court should hold that the riparian owner had a title to the submerged lands, and was entitled to be compensated for their appropriation for a public purpose connected with navigation, it would be the duty of this court to overrule such a decision.

As, for the reasons already mentioned, no such question is now before us, and, therefore, those portions of the opinion of the majority cannot justly be hereafter regarded as furnishing a rule of decision in such a case, yet I must be permitted to disavow such a proposition.. When the case does arise, I incline to think it can be shown, upon principle and authority, that private property in submerged lands cannot be taken and exclusively occupied for a public purpose without just compensation. At all events, I submit that it will be in time to decide so important a question when it necessarily arises, and when the rights of the owner of the property have been asserted and defended in argument.

The real question then in this case is whether an owner of land abutting on a public navigable river, but whose title does not extend beyond the high-water line, is entitled to compensation "because of the permanent and total obstruction of his right of access to navigability resulting from the maintenance of a pier constructed by the United States in the river opposite such land for the purpose of improving navigation."

To answer such a question, the *nature* of the riparian right of access must be first determined. That he has such a right all must admit. But does his right constitute "private property" within the meaning of the Constitution, or is it in the

nature of a license, or prescription, of which he can be deprived for the benefit of the public without being entitled to compensation ?

The term "property," standing alone, includes everything that is the subject of ownership. It is a *nomen generalissimum*, extending to every species of valuable right and interest, including things real and personal, easements, franchises, and other incorporeal hereditaments. *Boston R. R. Co.* v. *Salem*, 2 Gray, 35 ; Shaw, C. J.

"The term 'property,' as applied to lands, comprehends every species of title inchoate or complete. It is supposed to embrace those rights which lie in contract, those which are executory, as well as those which are executed." *Soulard et al.* v. *United States*, 4 Pet. 511 ; Marshall, C. J.

Private property is that which is one's own ; something that belongs or inheres exclusively in an individual person..

The right which a riparian owner has in a navigable stream when traveling upon it, or using it for the purpose of navigation, must be distinguished from his right to reach navigable water from his land and to reach his land from the water. The former right is one which belongs to him as one of the public, and its protection is found in indictments at the suit of the public— sometimes, in special circumstances, in proceedings in equity for the use of all concerned. Being a public right, compensation cannot be had by private parties for any injury affecting it. The latter right is a private one, incident to the ownership of the abutting property, in the enjoyment of which such owner is entitled. to the protection of private remedies afforded by the law against wrongdoers, and for which, if it is taken from him for the benefit of the public, he is entitled to compensation.

This distinction has always been recognized by the English courts.

*Rose* v. *Groves*, 5 M. & G. 613, was a case where an innkeeper was held entitled to recover damages against a defendant for wrongfully preventing the access of guests to his home situated on the river Thames by placing timbers in the river opposite the inn, and wherein, meeting the contention that the plaintiff had no private right of action, but that his remedy was by pro-

ceedings for a public nuisance, Chief Justice Tindal said : "This is not an action for obstructing the river, but for obstructing the access to the plaintiff's home on the river."

In *Lyon* v. *Fishmongers' Co.*, 1 App. Cas. 662, Lord Cairns said :

"As I understand the judgment in *Rose* v. *Groves*, it went not upon the ground of public nuisance, accompanied by particular damage to the plaintiff, but upon the principle that a private right of the plaintiff had been interfered with. The plaintiff, an innkeeper on the banks of a navigable river, complained that the access of the public to his home was obstructed by timber which the defendant had placed in the river ; and it would be the height of absurdity to say that a private right was not interfered with, when a man who has been accustomed to enter his home from a highway finds his doorway made impassable, so that he no longer has access to his house from the public highway. This would equally be a private injury to him, whether the right of the public to pass and repass along the highway were or were not at the same time interfered with. Chief Justice Tindal, in *Rose* v. *Groves*, put the case distinctly upon the footing of an infringement of a private right. He says : ' A private right is set up on the part of the plaintiff, and to that he complains that an injury has been done ; ' and then, after stating the facts, adds : ' It appears to me, therefore, that the plaintiff is not complaining of a public injury.' "

Elsewhere, in the same case, Lord Cairns said :

"Independently of the authorities, it appears to me quite clear, that the right of a man to step from his own land into a highway is something quite different from the public right of using the highway.

"Unquestionably the owner of a wharf on the river bank has, like every other subject of the realm, the right of navigating the river as one of the public. This, however, is not a right coming to him *qua* owner or occupier of any lands on the bank ; nor is it a right which *per se* he enjoys in a manner different from any other member of the public.

"But when this right of navigation is connected with an exclusive access to and from a particular wharf, it assumes a very

different character. It ceases to be a right held in common with the rest of the public, for other members of the public have no access to or from the river at the particular place, and it becomes a form of enjoyment of the land, the disturbance of which may be vindicated in damages by an action or restrained by an injunction. It is, as was decided by the House of Lords in the cases to which I have referred, a portion of the valuable enjoyment of the land, and any work which takes it away is held to be ' an injurious affecting of the land,' that is to say, the occasioning to the land of an *injuria*, or an infringement of right. The taking away of river frontage, interrupting the access between the wharf and the river, may be an injury to the public right of navigation, but it is not the less an injury to the owner of the wharf, which, in the absence of parliamentary authority, would be compensated by damages or altogether prevented." 1 App. Cas. 671.

This distinction between the right of immediate access from the abutter's property to and from a highway, whether a street or a navigable stream, and an injury arising after he reaches it and which is common to him and the rest of the public, is recognized by the courts of the States, and the former right is held to be a valuable one, which cannot be destroyed without compensation.

Thus, in *Haskell* v. *New Bedford*, 108 Mass. 208, it was held that where a sewer constructed by the city of New Bedford discharged filth into the dock of the plaintiff obstructing his use of it, it created a private nuisance to the plaintiff upon his own land for which he could maintain an action for the special damages thereby occasioned to him, without regard to the question whether it was also a nuisance to the public, Mr. Justice Gray, now a justice of this court, saying: "The plaintiff's title extended, by virtue of the statute of 1806, to the channel of the river; and the filling up of the dock impaired his use and enjoyment of it for the purpose for which it had been constructed and actually used; and the injury thus done to him differed, not only in degree but in kind, from the injury to the public by interference with navigation. Neither this special injury to him, nor that occasioned to his premises by making them offen-

sive and unhealthy was merged in the common nuisance"—
and citing, among other cases, *Rose* v. *Groves*, one of the English cases above mentioned.

And in *Brayton* v. *Fall River*, 113 Mass. 218, it was held that while the owner of a wharf upon a tide-water creek cannot maintain an action for an illegal obstruction to the creek, that being a common damage to all who use it, yet for an obstruction adjoining the wharf which prevents vessels from lying in it in the accustomed manner, this being a particular damage, he can maintain an action.

In *Delaplaine* v. *Chicago & N. W. Railway*, 42 Wisconsin, 214, the Supreme Court of Wisconsin held that—

"While the riparian proprietor only takes to the water line, it by no means follows, nor are we willing to admit, that he can be deprived of his riparian rights without compensation. As proprietor of the adjoining land, and as connected with it, he has the right of exclusive access to and from the waters of the lake at that particular place; he has the right to build piers and wharves in front of his land out to navigable waters in aid of navigation, not interfering with the public use. These are private rights incident to the ownership of the shore, which he possesses distinct from the rest of the public. . . .

"It is evident from the nature of the case that these rights of user and of exclusion are connected with the land itself, grow out of its location, and cannot be materially abridged or destroyed without inflicting an injury upon the owner which the law should redress. It seems unnecessary to add the remark that these riparian rights are not common to the citizens at large, but exist as incidents to the right of the soil itself adjacent to the water. In other words, according to the uniform doctrine of the best authority, the foundation of riparian rights, *ex vi termini*, is the ownership of the bank or shore." "These riparian rights are undoubted elements in the value of property thus situated. If destroyed, can any one seriously claim that the plaintiffs have not suffered a special damage in respect to their property, different both in degree and kind from that sustained by the general public? It seems to us not."

In *Brisbane* v. *St. Paul &c. Railroad*, 23 Minnesota, 114, it

was held by the Supreme Court of Minnesota that the State could not give a railroad company the right to occupy a riparian front without making compensation for the injury to riparian rights. The court, after citing cases in this court, said:

"According to the doctrine of these decisions the plaintiff possessed the right to enjoy free communication between his abutting premises and the navigable channel of the river, to build and maintain, for his own and the public use, suitable landing places, wharves, etc. .. . . The rights which thus belonged to him as riparian owner of the abutting premises were valuable property rights, of which he could not be divested, without authority, except by due process of law, and, if for public purposes, upon just compensation."

In *The Indiana &c. Railway Co.* v. *Eberle*, 110 Indiana, 445, the Supreme Court of Indiana said:

"Whatever may be the rule of decision elsewhere, nothing is better settled in this State than that the owners of lots abutting on a street may have a peculiar and distinct interest in the easement in the street in front of their lots. This interest includes the right to have the street kept open and free from any obstruction which prevents or materially interferes with the ordinary means of egress from and ingress to the lots. It is distinguished from the interest of the general public, in that it becomes a right appendant and legally adhering to the contiguous grounds and the improvements thereon as the owner may have adapted them to the street. To the extent that the street is a necessary and convenient means of access to the lot, it is as much a valuable property right as the lot itself. It cannot, therefore, be perverted from the uses to which it was originally dedicated, nor devoted to uses inconsistent with street purposes, without the abutting owner's consent, until due compensation be first made according to law for any injury or damage which may directly result from such interference."

This right of the owner of a lot abutting on a street to free access to and from the street, which right is analogous to the one we are here considering, has been frequently considered by the state courts, and some of the conclusions reached are thus stated in Dillon's Municipal Corporations, vol. 2, sec. 656, (4th ed.):

" The full conception of the true nature of a public street in a city, as respects the rights of the public on the one hand, and the rights of the adjoining owner on the other, has been slowly evolved from experience. It has been only at a recent period that these two distinct rights have, separately and in their relations to each other, come to be understood and defined with precision. The injustice to the abutting owner arising from the exercise of unrestrained legislative power over streets in cities was such that the abutter necessarily sought legal redress, and the discussion thence ensuing led to a more careful ascertainment of the nature of streets, and of the rights of the adjoining owner in respect thereof. It was seen that he had in common with the rest of the public a right of passage. But it was further seen that he had rights not shared by the public at large, special and peculiar to himself, and which arose out of the very relations of his lot to the street in front of it; and that these rights, whether the bare fee of the streets was in the lot owner or in the city, were rights of property, and as such ought to be and were as sacred from legislative invasion as his right to the lot itself. In cities the abutting owner's property is essentially dependent upon sewer, gas and water connections; for these such owner has to pay or contribute out of his own purse. He has also to pay or contribute towards the cost of sidewalks and pavements. These expenditures, as well as the relation of his lot to the street, give him a special interest in the street in front of him, distinct from that of the public at large. He may make, as of right, all proper uses of the street subject to the paramount right of the public for all street uses proper, and subject also to reasonable and proper municipal and police regulation. Such rights, being property rights, are like other property rights under the protection of the Constitution."

The courts of New York, which formerly took another view, now hold that right of access is a valuable property right and entitled to constitutional protection as such. *Steers* v. *Brooklyn*, 101 N. Y. 51 ; *Langdon* v. *New York*, 93 N. Y. 129.

It is true that, in the later case of *Sage* v. *The Mayor*, 154 N. Y. 61, it was held that the riparian rights of the owner of lots abutting on the Harlem River, a tidewater stream, are

subordinate to the rights of the city of New York, under its ancient charters supplemented by constitutional legislation and state grants, to fill in and make improvements, such as an exterior street, docks and bulkheads, from the high-water mark in front of his upland to and below low-water mark, essential to navigation and commerce, without compensation. But the opinion shows that the decision was put wholly upon the law of the State of New York, as declared in the authorities cited. Thus the language of Gerard in his work on Titles to Real Estate is adopted:

"It has been established in this State—New York—by judicial decision that the legislature of the State has an inherent right to control and regulate the navigable waters within the State. . . . The individual right of the riparian owner was considered as subject to the right of the State to abridge or destroy it at pleasure by a construction or filling in beyond his outer line, and that, too, without compensation made."

And again, the court says:

"In other States, some of the authorities are in accord, while others are opposed to the rule adopted in this State. The want of harmony is probably owing to the difference in the rule as to the ownership of the tideway, which is held in some jurisdictions to belong to the State, and in others to the riparian proprietors. This also accounts for the want of harmony in the Federal courts, as they follow the courts of the State where the case arose, unless some question arises under an act of Congress."

This case, therefore, must be regarded as an adjudication that, in the State of New York, the nature and extent of riparian rights are to be determined by the law of the State, and that the Federal courts, in passing upon such rights, follow that law.

In *Barkus* v. *Detroit*, 49 Michigan, 110, it was held by the Supreme Court of Michigan, per Cooley, J., that "the better and more substantial doctrine is that the land under the water in front of a riparian proprietor, though beyond the line of private ownership, cannot be taken and appropriated to a public use by a railway company under its right of eminent domain without making compensation to the riparian proprietor."

Leaving the decisions of the state courts, let us turn to those of this court, and I shall not consider it necessary to advert to the earlier decisions, because they are referred to and considered in the later ones.

*Railroad Company* v. *Schumeir*, 7 Wall. 272, was a case involving the right of the complainant, Schumeir, to enjoin the St. Paul &c. R. R. Company from taking possession and building its railroad upon certain ground in the city of St. Paul, Minnesota, bordering on the Mississippi River, and lying between lots of the complainant and that river. The railroad company claimed to own the land in fee under a congressional land grant of May 22, 1857. The Supreme Court of Minnesota held that the complainant was entitled to a decree as prayed for; and this court, on appeal, affirmed the judgment of the Supreme Court of Minnesota, holding that, under the case of *Dutton* v. *Strong*, 1 Black, 23, although riparian owners are limited to the stream, still they also have the same right to construct suitable landings and wharves, for the convenience of commerce and navigation, as is accorded riparian properties bordering on navigable waters affected by the ebb and flow of the tide; and, speaking of the contention, on behalf of the railroad company, that the complainant had dedicated the premises to the public as a street, and had thus parted with his title to the same, this court said:

"Suppose the construction of that provision, as assumed by the respondents, is correct, it is no defense to the suit, because it is nevertheless true, that the municipal corporation took the title in trust, impliedly, if not expressly, designated by the acts of the party making the dedication. They could not, nor could the State, convey to the respondents any right to disregard the trust, or to appropriate the premises to any purpose which would render valueless the adjoining real estate of the complainant."

In *Yates* v. *Milwaukee*, 10 Wall. 497, on appeal from the Circuit Court of the District of Wisconsin, it was *held* that the owner of land, bounded by a navigable river, has certain riparian rights, whether his title extend to the middle of the stream

or not; that among these are free access to the navigable part of the stream, and the right to make a landing, wharf or pier, for his own use, or for the use of the public; that those rights are valuable, and are property, and can be taken for the public good only when due compensation is made. In the opinion, per Miller, J., it was said:

"Whether the title of the owner of such a lot extends beyond the dry land or not, he is certainly entitled to the rights of a riparian proprietor whose land is bounded by a navigable stream; and among those rights are access to the navigable part of the river from the front of his lot, the right to make a landing, wharf or pier for his own use or for the use of the public, subject to such general rules and regulations as the legislature may see proper to impose for the protection of the rights of the public, whatever those may be. . . . This riparian right is property, and is valuable, and though it must be enjoyed in due subjection to the rights of the public, it cannot be arbitrarily or capriciously destroyed or impaired. It is a right of which, when once vested, the owner can only be deprived in accordance with established law, and, if necessary that it be taken for the public good, upon due compensation."

Accordingly this court reversed the decree of the Circuit Court, and instructed it "to enter a decree enjoining the city of Milwaukee, defendant below, from interfering with plaintiff's wharf, reserving, however, the right of the city to remove or change it so far as may be necessary in the actual improvement of the navigability of the river, and upon due compensation made."

The opinion in *Yates* v. *Milwaukee*, like that of the majority in the present case, may be liable to the criticism made upon it in *Shively* v. *Bowlby*, 152 U. S. 1, 36, as having gone too far in saying that the owner of land adjoining any navigable water, whether within or above the ebb and flow of the tide, has, *independently of local law*, a right of property in the soil below high-water mark, and the right to build out wharves so far, at least, as to reach water really navigable. But so corrected, it is a direct authority for the proposition we are now considering, namely, that riparian rights, when recognized as existing by

the law of the State, are a valuable property, and the subject of compensation when taken for public use.

In the case of *Weber* v. *Harbor Commissioners*, 18 Wall. 64, it was said :

"It is unnecessary for the disposition of this case to question the doctrine that a riparian proprietor, whose land is bounded by a navigable stream, has the right of access to the navigable part of the stream in front of his land, and to construct a wharf or pier projecting into the stream for his own use, or the use of others, subject to such general rules and regulations as the legislature may prescribe for the protection of the public, as was held in *Yates* v. *Milwaukee*. On the contrary, we recognize the correctness of the doctrine as stated and affirmed in that case."

In *Potomac Steamboat Co.* v. *Upper Potomac Steamboat Co.*, 109 U. S. 682, Mr Justice Matthews, delivering the opinion of this court, quoted with approval the definition of a riparian owner and of his right of access to a navigable river in front of his lot, given by Mr. Justice Miller in *Yates* v. *Milwaukee.*

In *Illinois Central Railroad* v. *Illinois*, 146 U. S. 445, this court said : "The riparian proprietor is entitled, among other rights, as held in *Yates* v. *Milwaukee*, 10 Wall. 497, to access to the navigable part of the water on the front of which lies his land, and for that purpose to make a landing, wharf or pier for his own use or for the use of the public, subject to such general rules and regulations as the legislature may prescribe for the protection of the public. In the case cited the court held that this riparian right was property and valuable ; and though it must be enjoyed in due subjection to the rights of the public, it could not be arbitrarily or capriciously impaired."

In *Eldridge* v. *Trezevant*, 160 U. S. 452, it was again held by this court, following *Hardin* v. *Jordan*, 140 U. S. 371, 384, and *Shively* v. *Bowlby*, 152 U. S. 1, 58, that the nature and legal incidents of land abutting on navigable streams were declared by the law of the State wherein the land was situated. A bill was filed in the Circuit Court of the United States for the Western District of Louisiana by Eldridge, a citizen of Mississippi, against the board of engineers of the State of Louisiana

and one Trezevant, who had been employed by that board to construct a public levee through a plantation belonging to the complainant and situated in Carroll township, State of Louisiana, in pursuance of an act of the general assembly of the State. The Circuit Court dismissed the bill, and an appeal was taken to this court. It appeared, and indeed was conceded by the appellant, that under the law and constitution of the State, and under French law existing before the transfer of the territory to the United States, land for the construction of a public levee on the Mississippi River could be taken, without compensation, by reason of a servitude on such lands for such a purpose. But it was contended on behalf of the appellant that, because he was a citizen of another State, and because he derived his title through a patent of the United States, that whatever may have been the condition of the ancient grants, no such condition attached to his ownership, and that the lands, bordering on a navigable stream, were as much within the protection of the constitutional principle awarding compensation as other property.

After reviewing the provisions of the constitution and laws of the State and the decisions of the state court construing them, and citing the Federal decisions, this court said:

"These decisions not only dispose of the proposition that lands, situated within a State, but whose title is derived from the United States, are entitled to be exempted from local regulations admitted to be applicable to lands held by grant from the State, but also of the other proposition that the provisions of the Fourteenth Amendment extend to and override public rights, existing in the form of servitudes or easements, held by the courts of a State to be valid under the constitution and laws of such State.

" The subject-matter of such rights and regulations falls within the control of the States, and the provisions of the Fourteenth Amendment of the Constitution of the United States are satisfied if, in cases like the present one, the state law, with its benefits and obligations, is impartially administered. *Walker* v. *Sauvinet*, 92 U. S. 90; *Davidson* v. *New Orleans*, 96 U. S. 97; *Missouri* v. *Lewis*, 101 U. S. 22; *Hallinger* v. *Davis*, 146 U. S.

314. The plaintiff in error is, indeed, not a citizen of Louisiana, but he concedes that, as respects his property in that State, he has received the same measure of right as that awarded to its citizens, and we are unable to see, in the light of the Federal Constitution, that he has been deprived of his property without due process of law, or been denied the equal protection of the laws."

The case of *Gibson* v. *United States*, 166 U. S. 269, is cited and relied on in the majority opinion. In that case the owner of a farm fronting on the Ohio River filed a petition in the Court of Claims complaining of the construction by the United States of a dike in the bed of the river, and which the plaintiff alleged to interfere with her landing. The principal finding of the Court of Claims was as follows:

" Claimant's access to the navigable portion of the stream was not entirely cut off; at a 9-foot stage of the water, which frequently occurs during November, December, March, April and May, she could get into her dock in any manner; that from a 3-foot stage she could communicate with the navigable channel through the chute; that at any time she could haul out to the channel by wagon."

The only injury suffered, therefore, by the plaintiff was the inconvenience of having to haul her produce by wagon over and across the dike in such portions of the year when the water was below a 3-foot stage, and when, at that part of the Ohio River, navigation was almost wholly suspended. At other times, and when the stage of the water permitted navigation, the plaintiff had the use of her dock. The Court of Claims dismissed the petition, and its decree was affirmed by this court. There was no pretense that the dike in question touched the plaintiff's land at any point.

The Chief Justice, in the opinion, put the judgment chiefly on the decisions of the state court. He said: " By the established law of Pennsylvania, as observed by Mr. Justice Gray in *Shively* v. *Bowlby,* ' the owner of lands bounded by navigable water has the title in the soil between high and low-water mark, subject to the public right of navigation and the authority of the legislature to make public improvements upon it, and to

regulate his use of it.'" And after citing several Pennsylvania cases, the Chief Justice concluded his opinion by saying: "In short, the damage resulting from the prosecution of the improvement of a navigable highway, for the public good, was not the result of a taking of the appellant's property, and was merely incidental to the exercise of a servitude to which her property had always been subject." It is obvious, therefore, that in this case the court applied the doctrine of *Eldridge* v. *Trezevant*, which was cited in the opinion, and that the servitude to which the plaintiff's lands were said to be subject was a servitude existing under the state law, and not a servitude created by Federal law.

In the States which originally formed this Union, or in those admitted since, it has never been held that the United States, through any of their departments, could impose servitudes upon the lands owned by the States or by their grantees. The cases are all the other way. *New Orleans* v. *United States*, 10 Pet. 662, 736; *Pollard* v. *Hagan*, 3 How. 212; *Barney* v. *Koekuk*, 94 U. S. 324; *Van Brocklin* v. *Tennessee*, 117 U. S. 151, 168; *Shively* v. *Bowlby*, 152 U. S. 1.

In the recent case of *Morris* v. *United States*, 174 U. S. 196, the question of the nature and extent of riparian rights on the Potomac River in front of the city of Washington was involved. The majority of the court held that, under the evidence, the title of the owners of lots in the city plans were bounded by Water Street, and that, therefore, such owners possessed no riparian rights entitled to compensation by the United States in carrying out a scheme of improvement of the waters of the river.

The opinion of the court proceeded on the assumption, as matter of law, that owners of land abutting on the river would be possessed of riparian rights, and entitled, therefore, to compensation, if such rights were impaired or destroyed by the improvements proposed by the Government, but held, as a conclusion from the evidence, that, as matter of fact, the owners of lots under the city plans did not have titles extending to the river, but that their lots were bounded by Water Street, the title to which was in the city, and therefore no compensation for

exclusion from the river could be enforced. The case, there-
fore, may be properly regarded as an authority for the prop-
osition that the owners of lots abutting on a navigable river
are entitled to compensation if their riparian right of access is
taken from them by improvements made by the Government
to promote the navigability of the Potomac River. The long
investigation by court and counsel was, indeed, labor in vain if,
at last, riparian rights possessed by the lot owners, should be
decided not to be private property within the protection of the
Constitution.

If, then, by the law of the State in which the land is situated,
the right of access to navigable streams is one of the incidents
of abutting land, if such rights are held to be property and val-
uable as such, can the United States, under the incidental power
arising out of their jurisdiction over interstate commerce, de-
stroy such right of access without making compensation? I
think that this question may well be answered in the words of
Gould in his work on Waters (2d ed.), sec. 151: "When it is
conceded that riparian rights are property, the question as to
the right to take them away without compensation would ap-
pear to be at an end."

The argument against the right of compensation in such a
case seems to be based upon an assumption that because the
Government has the power to make improvements in navigable
waters, it follows that it can do so without making compensa-
tion to the owners of private property destroyed by the im-
provements. But this assumption is, as I think, entirely with-
out foundation, and, if permitted by the courts to be made
practically applicable, would amount to a disregard of the ex-
press mandate of the Constitution that private property shall
not be taken for public uses without just compensation.

"The power to establish post offices and to create courts
within the States was conferred upon the Federal Government,
and included in it was authority to obtain sites for such offices
and for court houses, and to obtain them by such means as
were known and appropriate. The right of eminent domain
was one of those means well known when the Constitution was
adopted, and employed to obtain land for public uses. Its exist-

ence, therefore, in the grantee of that power ought not to be questioned. The Constitution itself contains an implied recognition of it beyond what may justly be implied from the express grants. The Fifth Amendment contains a provision that private property shall not be taken for public use without just compensation. What is that but an implied assertion, that, on making just compensation, it may be taken?" *Kohl* v. *United States*, 91 U. S. 367, 374.

Accordingly in that case, a proceeding instituted by the United States to appropriate a parcel of land in the city of Cincinnati as a site for a post office and other public uses, was upheld, but those proceedings contemplated compensation, and Congress, in the act authorizing the proceedings, appropriated money for the purpose.

Now if, in order to render valid an appropriation of private property for the use of the Government in the erection of post offices and court houses compensation must be made, what is the difference in principle if the Government is appropriating private property for the purpose of improving the navigation of a navigable stream? This question has been already put and answered by this court in *Monongahela Navigation Company* v. *United States*, 148 U. S. 312, where it was said:

"It cannot be doubted that Congress has the power in its discretion to compel the removal of this lock and dam as obstructions to the navigation of the river, or to condemn and take them for the purpose of promoting its navigability. In other words, it is within the competency of Congress to make such provision respecting the improvement of the Monongahela River as in its judgment the public interests demand. Its dominion is supreme.

"But like other powers granted to Congress by the Constitution, the power to regulate commerce is subject to all the limitations imposed by such instrument, and among them is that of the Fifth Amendment we have heretofore quoted. Congress has supreme control over the regulation of commerce, but if, in exercising that supreme control, it deems it necessary to take private property, then it must proceed subject to the limi-

tations imposed by this Fifth Amendment, and can take only on payment of just compensation."

"The power to regulate commerce is not given in any broader terms than that to establish post offices and post roads; but if Congress wishes to take private property upon which to build a post office, it must either agree upon the price with the owner, or in condemnation pay just compensation therefor. . . . And that which is true in respect to a condemnation of property for a post office is equally true when condemnation is sought for the purpose of improving a natural highway."

As already remarked, the power of the Government to control and regulate navigable streams and to carry into effect schemes for their improvement, is not directly given by the Constitution, but is only recognized by the courts as an incident to the power expressly given to regulate commerce between the States and with foreign nations.

Now, if it be held that Congress has power to take or destroy private property, lying under or adjacent to navigable streams, without compensating their owners, because it is done in the exercise of the power to regulate commerce, then it must follow that the same unlimited power can be exercised with respect to private property not in nor bounded by water. The power of Congress to regulate commerce is not restricted to commerce carried on in lakes and rivers, but equally extends to commerce carried on by land. If Congress, yielding to a loud and increasing popular demand that it should take possession and control of the railroads of the country, or should undertake the construction of new railroads as arteries of commerce, this novel notion, that the existence of the right to regulate commerce creates of itself and independently of the law of the State a Federal servitude on all property to be affected by the exercise of that right, would apply to all kinds of private property wherever situated.

But it may be asked why, if the question as to riparian rights is one of state law, the decision of the Supreme Court of Michigan in the present case, denying the claim of the abutting owner for compensation for the loss of his access to the river, is not conclusive?

The answer to this question will be found in the opinion of that court. Instead of ascertaining and applying, or professing to apply, the law of the State in respect to riparian rights, the Supreme Court of Michigan treated the question as one under Federal law, and, following what it understood to be the doctrine laid down by several Federal Circuit Court decisions as obligatory, held that it was competent for the Government of the United States, in the exercise of its power to regulate commerce between the States, to deprive abutting owners of their right of access to navigable streams, without compensating them for their loss. The cases so relied on were *Stockton* v. *Baltimore & N. Y. R. R. Co.*, 32 Fed. Rep. 9; *Hawkins Point Lighthouse Case*, 39 Fed. Rep. 77; and *Scranton* v. *Wheeler*, 57 Fed. Rep. 803.

The first of these cases arose on a bill filed in the Circuit Court of the United States for the District of New Jersey by the attorney general of New Jersey, seeking to restrain the Baltimore and New York Railroad Company, acting under congressional authority, from occupying without compensation land belonging to the State of New Jersey, lying under tidewaters, by the pier of a bridge. Mr. Justice Bradley, refusing the injunction, said:

"The character of the state's ownership of the land under water—an ownership held, not for the purpose of emolument, but for public use, especially the public use of navigation and commerce—the question arises whether it is a kind of property susceptible of pecuniary compensation within the meaning of the Constitution. The Fifth Amendment provides only that *private property* shall not be taken without compensation, making no reference to public property. But if the phrase may have an application broad enough to include all property and ownership, the question would still arise whether the appropriation of a few square feet of the river bottom to the foundation of a bridge, which is to be used for the transportation of an extensive commerce in aid and relief of that afforded by the waterway, is at all a diversion of the property from its original use."

Mr. Justice Bradley was himself a New Jersey lawyer, and

availed himself, in that case, of the law of that State, which has always been to the effect that the land underlying the tide waters belonged to the State, and was held for a public use. His view was that as, under the law of New Jersey, the land beneath tide waters was held by the State for public uses, such land was not *private property* within the meaning of the Constitution, or that, at all events, its occupation, to a limited extent, by the pier of a bridge intended to promote commerce, was not a diversion of the property from its original use.

It needs no argument to show that such a decision is not applicable to the present case.   Indeed, it is plain that if the case had been one involving the right of an abutter to access to the tide water, the same being, under the laws of the State, private property, the decision of that learned justice would have been very different.   He was the organ of this court in pronouncing the opinion in *Barney* v. *Keokuk*, 94 U. S. 324, where the question was whether the title of riparian proprietors on the banks of the Mississippi extended to ordinary high-water mark or to the shore between high and low-water mark, and said :

" In our view of the subject the correct principles were laid down in *Martin* v. *Waddell*, 16 Pet. 367 ; *Pollard's Lessee* v. *Hagan*, 3 How. 212 ; and *Goodtitle* v. *Kibbe*, 9 How. 471. These cases related to tidewater, it is true; but they enunciate principles which are equally applicable to all navigable waters. And since this court, in the case of *The Genessee Chief*, 12 How. 443, has declared that the Great Lakes and other navigable waters of the country, above as well as below the flow of the tide, are, in the strictest sense, entitled to the denomination of navigable waters, and amenable to the admiralty jurisdiction, there seems to be no sound reason for adhering to the old rule as to the proprietorship of the beds and shores of such waters. It properly belongs to the States by their inherent sovereignty, and the United States has wisely abstained from extending (if it could extend) its survey and grants beyond the limits of high water.   The cases in which this court has seemed to hold a contrary view depended, as most cases must depend, on the local laws of the States in which the lands are situated.   In Iowa, as

before stated, the more correct rule seems to have been adopted after a most elaborate investigation of the subject."

Whether the distinction suggested by Mr. Justice Bradley, between property held by the State for public purposes and private property, be or be not sound, the doctrine has no appli-cation to the present case, and, as the Circuit Court case was not brought for review to this court, the suggestion remains unadjudged.

The so-called *Hawkins Point Lighthouse* case was an eject-ment brought in the Circuit Court of the United States for the District of Maryland to recover possession of the land covered by a lighthouse erected on land lying under the waters of a tidewater navigable river, by the Lighthouse Board in pursu-ance of acts of Congress. The plaintiff claimed to be the owner of the submerged land, and the action did not involve the question of access to the river. Judge Morris held that the plaintiff was not entitled to recover; and, although stating that " the Court of Appeals of Maryland, whenever called upon to declaré the nature of the title of the State and its grantees in the land at the bottom of navigable streams, has uniformly held that the soil below high-water mark was as much part of the *jus publicum* as the stream itself," extended Mr. Justice Bradley's suggestion in the New Jersey case, and declared that the plaintiff, as grantee of the State, had no private property in the submerged land entitled to constitutional protection. As the structure was a lighthouse, the case might have been gov-erned by peculiar considerations, but the learned judge of the Circuit Court seems to have gone further, and to have held that, as a matter of Federal law, " In the hands of the State or of the State's grantees the bed of a navigable river remains sub-ject to an easement of navigation, which the General Govern-ment can lawfully enforce, improve and protect, and that it is by no means true that any dealing with a navigable stream which impairs the value of the rights of riparian owners gives them a claim to compensation." If, by this is meant that ri-parian owners may be deprived, without compensation, of ac-cess to navigable streams abutting on their land by reason of a supposed servitude or easement imposed by the power granted

to Congress by the Constitution to regulate commerce, then, for the reasons heretofore given and under the authorities cited, such a view cannot be sustained. The case under the name of *Hill* v. *United States*, was brought to this court, but the writ of error was dismissed on an independent ground, which rendered it unnecessary for this court to pass upon the questions ruled in the court below. That the question of the right of the plaintiff to be compensated for deprivation of his riparian rights was not considered, and, indeed, could not be, as it was held that neither the Circuit Court nor this court had jurisdiction. *Hill* v. *United States*, 149 U. S. 593.

Yet this was the case which the Supreme Court of Michigan said in their opinion "appeared to be exactly in point and to rule the present case."

The only other case relied on by the Supreme Court of Michigan was *Scranton* v. *Wheeler*, 57 Fed. Rep. 803; 16 U. S. App. 152, being this identical case, which had been removed from the state to the Federal court. It was subsequently brought to this court, but was dismissed because the record did not show that a Federal question had been raised or presented in the plaintiff's statement of his case in the state court. Accordingly the cause was remanded to the state court, and subsequently reached this court by a writ of error to the Supreme Court of Michigan. While the case was in the Circuit Court of Appeals an opinion was filed by Circuit Judge Lurton, in which, without adverting to the law of the State of Michigan, or citing any decisions of the Supreme Court of that State, in respect to riparian rights, he held that the right of the plaintiff of access to the navigable water was subordinate to the power of the Federal Government to control the stream for the purposes of commerce, and that the plaintiff was therefore not entitled to compensation for the extinction of his right.

The proposition, frequently made, that the power of Congress to regulate interstate commerce, and therefore navigation, is *paramount*, can properly be understood to mean only that, as between the authority of the States in such matters and that of the General Government, the latter is superior. It has no just reference to questions concerning private property lying

within the States.    Much less can it be rightly used to signify that such power can be exercised by Congress without regard to the right of just compensation when private property is taken for public use.

The suggestion that " the riparian owner acquired the right of access to navigability subject to the possibility that such right might become valueless in consequence of the erection under competent authority of structures on the submerged lands in front of his property, for the purpose of improving navigation," would seem to be irrelevant, because the liability that his private property may at all times be taken for public uses is known to every one.    But hitherto it has not been supposed that the knowledge of such liability deprives the owner of the right of compensation when his property is actually so taken.

Nor can the statement that, in the opinion of this court, " it was not intended by the framers of the Constitution that the paramount authority of Congress to improve the navigation of the public navigable waters of the United States should be crippled by compelling the Government to make compensation for the injury to a riparian owner's right of access to navigability that might incidentally result from an improvement," be admitted.    The *intention* of the framers is seen in the provisions of the Constitution, and in them the right to take private property for public uses is indissolubly connected with the duty to make just compensation.    It cannot be supposed that a recognition of such a duty would cripple the Government in the just exercise of the power it incidentally possesses to regulate interstate navigation.

As, then, the Supreme Court of Michigan considered the question solely as a Federal one, in which it supposed it was controlled by the Federal cases cited, this court has jurisdiction to review its judgment ; and as by that judgment the plaintiff in error has been refused the protection of the Constitution of the United States claimed by him, I think the judgment should be reversed and the cause remanded to be proceeded in according to law.