THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.* THE HUDSON RIVER CONNECTING RAILROAD CORPORATION, Respondent.

Third Department, March 5, 1919.

Constitutional law — interstate commerce — waters and watercourses — act of Congress authorizing railroad company to construct bridge across Hudson river near Castleton is paramount and conclusive — construction of bridge cannot be restrained under State legislation — title of State to land under navigable river — determination of Secretary of War under Federal act as to effect of construction of bridge upon formation of ice gorge is conclusive — when police power of State yields to Federal authority in matters of interstate commerce — when question as to whether or not river is a boundary between States immaterial — authority of State to control local corporation.

The act of Congress approved March 13, 1914, authorizing a railroad corporation organized under the laws of the State of New York to construct, maintain and operate a railroad bridge across the Hudson river near Castleton is paramount and exclusive and the construction of said bridge cannot be restrained under chapter 713 of the Laws of 1917 and chapter 166 of the Laws of 1918 of the State of New York.

The Federal legislation is supreme on the subject and was enacted quite independently of State legislation and was intended by Congress as a plenary and paramount grant of power to the railroad company for the construction of the bridge.

The land under the water of the Hudson river may be used for the construction of the piers for such a bridge without the consent of the State, since the title which the State has to land under a navigable river is not an unqualified title but is held by the State as trustee for the benefit of all the people and is subordinate and subject to the paramount right and authority of the United States in the exercise of its power to regulate commerce between the States and with foreign countries.

The determination of the question as to the formation of ice gorges by the construction of the bridge is included in the power given by the Federal act to the Secretary of War to formulate plans and specifications and his decision on the question is conclusive on the State and its inhabitants.

The police power of the State must yield to Federal authority in matters of interstate commerce when there is actual conflict.

When a railroad bridge spans a stream located wholly within a State and serves merely to connect termini within the same State, it is not an instrument of interstate commerce and the Federal government can assert no jurisdiction, except to see that the waters beneath the bridge are unobstructed for the purposes of navigation.   But when, as in the present case, such a bridge is an important instrument in the interstate commerce transportation of the country, it is quite immaterial whether the stream is or is not a boundary between States.   Even in such a case, Congress may elect that the power of the Federal government shall remain dormant and may merely acquiesce in construction authorized by the State Legislature.

Although the State Legislature may, within proper limits, control a corporation created by it, it cannot do so when the sole effect of the attempted control is to thwart the will of Congress in respect to a matter exclusively within its jurisdiction.   Hence, the State cannot prevent the construction of the bridge in question, or hinder, impede and embarrass its construction by arbitrarily or capriciously declaring it unlawful for its corporation to engage in such construction.

JOHN M. KELLOGG, P. J., dissented.

APPEAL by the plaintiff, The People of the State of New York, from an interlocutory judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Albany on the 1st day of August, 1918, overruling plaintiff's demurrer to certain defenses set up in the answer, dismissing the amended complaint on the merits and vacating the injunction herein.

An appeal is also taken from the order of the Supreme Court made at the Albany Special Term granting said relief and pursuant to which the interlocutory judgment was entered.

*Merton E. Lewis, Attorney-General [Claude T. Dawes* and *William E. Woollard, Deputies Attorney-General,* of counsel], for the appellant.

*Visscher, Whalen & Austin [Alexander S. Lyman* of counsel], for the respondent.

COCHRANE, J.:

Pursuant to an act of Congress approved by the President March 13, 1914, the defendant proposes to construct a railroad bridge across the Hudson river near Castleton in accordance with plans and specifications approved by the Secretary of War and the Chief of Engineers of the War Department, which bridge is to be an important factor in the interstate commerce transportation of the country. Under chapter 713 of the Laws of New York of 1917 and chapter 166 of the Laws of New York of 1918 the plaintiff seeks by this action to restrain the construction of said bridge other than a bridge with a single span with no piers or abutments between the dikes and with a clearance of not less than 135 feet above the mean level of the river, those conditions being required by said chapter 713 of the Laws of 1917. The question is as to the meaning and effect of the act of Congress, because as stated in *Erie R. R. Co.* v. *New York* (233 U. S. 671, 681): " The relative supremacy of the State and National power over interstate commerce need not be commented upon. Where there is conflict the State legislation must give way. Indeed, when Congress acts in such a way as to manifest its purpose to exercise its constitutional authority the regulating power of the State ceases to exist."

The exhaustive and painstaking opinion of Mr. Justice CHESTER, before whom the case was tried at Special Term (104 Misc. Rep. 19), in which opinion we concur, renders it unnecessary for us to do more than state some supplementary considerations in response to the questions which have been urged on our attention.

*First.* At the basis of the controversy lies the question

whether the act of Congress is exclusive or merely permissive. Did Congress intend to authorize and empower the defendant to build this bridge irrespective of any legislation by the State or did it simply intend to give its permission to the defendant to erect a structure across one of the navigable rivers of the country pursuant to authority from the State Legislature? An analysis of the Federal and State legislation furnishes an answer to this question. In 1913 the State Legislature, by chapter 388 of the Laws of that year, authorized the defendant to construct this bridge with a clearance of not less than 135 feet above the mean level of the river and provided that " between upper Schodack island and Shad island the spans of the said bridge shall be not less than three hundred feet in length in the clear from pier to pier," and provided also that the construction should be commenced on or before May 1, 1914, and completed within five years thereafter. This act was repealed by said chapter 713 of the Laws of 1917, which act reauthorizes the construction of the bridge with certain other restrictions already indicated. The act of Congress of 1914 is brief and its material portion is as follows: " That authority be, and is hereby, granted to the Hudson River Connecting Railroad Corporation, a corporation organized under the laws of the State of New York, its successors and assigns, to construct, maintain, and operate a bridge, together with the necessary approaches thereto, across the Hudson River, at a point suitable to the interests of navigation between Castleton and Schodack Landing, in accordance with the provisions of the Act entitled ' An Act to regulate the construction of bridges over navigable waters,' approved March twenty-third, nineteen hundred and six." (38 U. S. Stat. at Large, 308, chap. 38.) It will be observed that it makes no reference to the act of the State Legislature of 1913. Its grant of power is comprehensive and complete. It is in specific terms to the defendant. The only restriction on the proposed bridge is that it shall be " in accordance with the provisions of the Act entitled ' An Act to regulate the construction of bridges over navigable waters,' approved March twenty-third, nineteen hundred and six." This act of 1906 (34 U. S. Stat. at Large, 84–86, chap. 1130) is commonly known as the " Bridge Act," and that and the act of 1914 are manifestly to be read together. The act of

1906 declares among other things that any bridge built under authority of Congress over any of the navigable waters of the United States shall be built according to plans and specifications approved by the Secretary of War and Chief of Engineers, from which there shall be no deviation except on like approval, which bridge shall be a lawful structure and shall be recognized and known as a post route, and the act regulates the charges for the transmission over the bridge of mails, troops and munitions of war of the United States and provides that the United States may construct, maintain and repair without charge telegraph and telephone lines upon said bridge and its approaches and declares that all railroad companies shall be entitled to equal rights and privileges relative to the passage of trains over the bridge for a reasonable compensation and that all disagreements in regard to the terms of such use or the payments therefor shall be determined by the Secretary of War. In section 6 thereof it further provides that the construction of the bridge shall be commenced within one year and completed within three years from the date of the passage of the act of Congress authorizing such construction. (34 U. S. Stat. at Large, 86, § 6.) In 1916 Congress amended the act of 1914 by extending the time for the commencement and completion of the bridge to March 30, 1918, and March 13, 1920, respectively. (39 U. S. Stat. at Large, 446, chap. 307.) It thus clearly appears that the provisions of the Federal and State legislation are in conflict not only in respect to the time of the commencement and completion of the structure but also in respect to the type of construction. Twice Congress expressly overruled the declaration of the Legislature as to the time both for the commencement and completion of the construction of the bridge. But perhaps a more important consideration is that the State has attempted to regulate the height of the bridge and has declared that it shall have but a single span with no piers or abutments between the dikes and those features are made the important conditions without which the bridge cannot be constructed, whereas the Federal legislation ignores those features and limits the construction only to plans to be approved by the Secretary of War and Chief of Engineers. Congress did not acquiesce in what the Legislature proposed but its provisions are irreconcilable with those of the Legislature. It

seems to follow very clearly that the Federal legislation is supreme on the subject and that it was enacted quite independently of State legislation and was intended by Congress as a plenary and paramount grant of power to the defendant for the construction of the bridge. It may be that the "Bridge Act" alone would not justify this conclusion, but its provisions become significant in connection with the act of 1914 which by the phraseology employed compels the conclusion that it was intended as a complete and exclusive grant of power. There is nothing to indicate that any legislation of the State, past or prospective, was in the mind of Congress when it created the act of 1914.

*Second.* It is seriously contended that the land under the water of the river belongs to the State and that without the consent of the latter the submerged land may not be used for the construction of bridge piers. That the Federal government may without compensation erect on such land lighthouses, dikes, locks, dams and breakwaters is admitted, but it is said that such structures are in aid of navigation. In the early history of the country there were no railroads and commerce was mainly conducted by water transportation. But with the growth of the country and the development of the railroads commerce by railroad transportation came to be of as much or greater importance than commerce by water and no distinction is discernible in what the government may do in aid of either water or land transportation. If it can build a lighthouse on the submerged land of a navigable stream for the purpose of assisting interstate commerce it can by the same token build a bridge pier for the same purpose. Navigation is only a branch of commerce and whatever power Congress possesses in respect to navigation is derived from the interstate commerce clause of the Federal Constitution (Art. 1, § 8, subd. 3). Without the power to regulate commerce there would be no power in the Federal government to regulate navigation. (*State of Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 18 How. [U. S.] 421, 431; *Gibbons* v. *Ogden*, 9 Wheat. 1; *Scranton* v. *Wheeler*, 179 U. S. 141, 159; *Gilman* v. *Philadelphia*, 70 id. [3 Wall.] 713; *Miller* v. *Mayor of New York*, 109 id. 385.) "It is commerce, and not navigation, which is the great object of constitutional care," says Mr. Justice Bradley in *Stockton*

v. *Baltimore & N. Y. R. Co.* (32 Fed. Rep. 9, 20). The plaintiff has demurred to the answer and by such demurrer has admitted the allegations that the purpose of the bridge is the operation of trains for the "transportation of persons and property between points in the States of New York and Massachusetts, and points in other States of the United States and Canada." Many cases in the Supreme Court of the United States make it clear that the title which the State has to land under a navigable river is not an unqualified title but that the State holds such title as trustee for the benefit of all the people and that such title is subordinate and subject to the paramount right and authority of the United States in the exercise of its power to regulate commerce between the States and with foreign countries. The rule is stated in *People* v. *Delaware & Hudson Company* (213 N. Y. 194, 199) as follows: "The title to the bed of navigable streams and the control of navigable waters are vested in the State, subject to the limitations found in the Federal Constitution. (*Langdon* v. *Mayor, etc., of N. Y.*, 93 N. Y. 129.)" In *Decker* v. *Baltimore & N. Y. R. Co.* (30 Fed. Rep. 723) and *Stockton* v. *Baltimore & N. Y. R. Co.* (*supra*) this question received careful and elaborate consideration and was decided adversely to the contention of the plaintiff. The last case is cited with approval in *Luxton* v. *North River Bridge Company* (153 U. S. 525) and *Scranton* v. *Wheeler* (179 id. 141).

*Third.* It is claimed that the construction of the bridge in the form proposed will facilitate the formation of ice gorges with its attendant flooding of adjacent property and that this is a matter of State concern. Ordinarily the State is supreme in matters of police regulation. Also it is probably true that in most instances the Federal government when it assumes jurisdiction over navigable waters leaves to State regulation matters of internal police affecting the comfort, convenience and prosperity of the people. But the State cannot seize on that feature of the case in order to dictate what kind of a bridge shall be constructed. As we have heretofore pointed out, the "Bridge Act" declares that the bridge shall be built according to plans and specifications approved by Federal authorities and that there shall be no deviation therefrom and that leaves the State powerless to dictate plans and specifica-

tions except through the medium of the Federal officials designated for that purpose. The determination of this question of ice gorges is included in the power to formulate plans and specifications. It is an incident of that power. When the Secretary of War determined on the plans and specifications according to which the bridge is to be built he took into consideration the effect of those plans and specifications on the formation of ice gorges, floods and other deleterious consequences to the people of the State. It appears affirmatively in this case that the Secretary of War considered this question after a hearing granted to all interested parties and reached the conclusion that the apprehended danger does not exist. But whether his conclusion is correct or not is of little moment as bearing on the question here presented, the point being that he is the officer designated by Congress as the one to determine that question and his determination is conclusive on the State and its inhabitants. The State cannot by virtue of its police power prevent that which Congress has specifically authorized. The authorities uniformly hold that the police power of a State must yield to Federal authority in matters of interstate commerce when there is actual conflict. (*Railroad Company* v. *Husen*, 95 U. S. 465; *Escanaba Company* v. *Chicago*, 107 id. 678; *Hennington* v. *Georgia*, 163 id. 299; *Morgan* v. *Louisiana*, 118 id. 455.) We content ourselves with a quotation from the case last cited, which is a statement in one form of a principle many times declared by the same court: " While it may be a police power in the sense that all provisions for the health, comfort and security of the citizens are police regulations, and an exercise of the police power, it has been said more than once in this court that, even where such powers are so exercised as to come within the domain of Federal authority as defined by the Constitution, the latter must prevail. *Gibbons* v. *Ogden*, 9 Wheat. 1, 210; *Henderson* v. *The Mayor*, 92 U. S. 259, 272; *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, 661. But it may be conceded that whenever Congress shall undertake to provide for the commercial cities of the United States a general system of quarantine, or shall confide the execution of the details of such a system to a national board of health, or to local boards, as may be found

expedient, all State laws on the subject will be abrogated, at least so far as the two are inconsistent. But, until this is done, the laws of the State on the subject are valid."

*Fourth.* We are repeatedly reminded by the appellant that the Hudson river at Castleton is not a boundary between States. That circumstance in many of the reported cases was important, but the value of those cases as authorities depends on what the courts said interpreted in the light of the distinguishing circumstances. When a railroad bridge spans a boundary stream between States it is necessarily an instrument of commerce between those States and the Federal jurisdiction *per se* attaches whenever Congress so declares. When a railroad bridge spans a stream located wholly within a State and serves merely to connect termini within the same State it is not an instrument of interstate commerce and the Federal government can assert no jurisdiction except to see that the waters beneath the bridge are unobstructed for the purposes of navigation. But when as in this case such a bridge is an important instrument in the interstate commerce transportation of the country it is quite immaterial whether the stream is or is not a boundary between States. Even in such a case Congress may elect that the power of the Federal government shall remain dormant and may merely acquiesce in construction authorized by the State Legislature. (*Greenleaf Lumber Co.* v. *Garrison,* 237 U. S. 251, 263; *Wisconsin* v. *Duluth,* 96 id. 379, 387.) Failure to observe these various lines of cleavage and the distinctions depending thereon lead to confusion of thought with resulting error.

*Fifth.* Plaintiff places much reliance on the case of *People* v. *International Bridge Company* (223 N. Y. 137) as sustaining this action. There is no similarity between the two actions. The act of Congress in that case (16 U. S. Stat. at Large, 173, chap. 176) did not purport to confer independent authority for the construction of the bridge. It was entirely dissimilar from the congressional act under which the defendant here derives its authority. As stated in the opinion of the Court of Appeals it confirmed the act of the Legislature and that was clearly the only purpose of Congress in its enactment. What was stated by the court in that case had reference to that fact and so understood is quite inapplicable to the present case. In the

language of Judge McLAUGHLIN, who wrote the opinion, the power of the Federal government which he was discussing was such as was " inherently possessed for the purpose of controlling interstate and foreign commerce." He quotes copiously from the cases of *Escanaba Co.* v. *Chicago* (107 U. S. 678) and *Cummings* v. *Chicago* (188 id. 410), in neither of which cases was there an act of Congress asserting affirmative jurisdiction independent of State control. That appears from the quotations from those cases contained in the opinion of the Court of Appeals. In the *Escanaba Co.* case it is stated: " But until Congress acts on the subject, the power of the State over bridges across its navigable streams is plenary," and in the *Cummings* case it is said: " But Congress has not passed any act under which parties, having simply the consent of the secretary, may erect structures in Calumet River without reference to the wishes of the State of Illinois on the subject."

*Sixth.* It is suggested that the State having created the defendant may limit its operation in respect to the bridge in question; that the creator may control its creature. In *Decker* v. *Baltimore & N. Y. R. Co.* (30 Fed. Rep. 723) that question seems to have been involved and if that case was correctly decided it is an authority in favor of the proposition that the State cannot by statute prevent its own corporation from building a bridge authorized by Congress. On principle, however, it seems to me entirely clear that the Legislature cannot thus indirectly defeat the will of Congress in respect to a matter wholly within the jurisdiction of the latter. " So unfettered is this control of Congress over the navigable streams of the country that its judgment as to whether a construction in or over such a river is or is not an obstacle and a hindrance to navigation, is conclusive. Such judgment and determination is the exercise of legislative power in respect of a subject wholly within its control." ( *United States* v. *Chandler-Dunbar Co.*, 229 U. S. 53, 64.) Ordinarily it may be true that the Legislature may within proper limits control a corpration created by itself. But the question here is whether it can do so when the sole effect of the attempted control is to thwart the will of Congress in respect to a matter exclusively within its jurisdiction. The State cannot prevent the construction of this bridge. Can it, therefore, hinder,

impede and embarrass its construction by arbitrarily or capriciously declaring it unlawful for its corporation to engage in such construction? It seems to me the only logical answer is in the negative. The repeal of chapter 388 of the Laws of 1913 by chapter 713 of the Laws of 1917 is unimportant. The defendant was incorporated under the General Railroad Law for the purpose of building a railroad which involved bridging the Hudson river. The Railroad Law (§§ 8, 21) conferred on the defendant authority for the structure in question on obtaining consent of the Public Service Commission. (*People* v. *Delaware & Hudson Company*, 213 N. Y. 194, 202.) Consent of the Public Service Commission was obtained and authority of the State for the construction of this bridge thereby became complete independently of the act of 1913. When, therefore, the Legislature in 1917 repealed the act of 1913 it repealed nothing of any value to the defendant and in authorizing the defendant to build a bridge of a certain limited type it granted nothing of any value. The act of 1917 does not purport to restrain or limit the operation of the defendant in the construction of this bridge. It is affirmative and not negative in its provisions. But chapter 166 of the Laws of 1918, passed after the commencement of this action, amends the General Railroad Law (Consol. Laws, chap. 49 [Laws of 1910, chap. 481], § 8, subd. 3) and is the only authority for this action. We need not consider the effect of this amendment on corporations hereafter created. As we have seen, the authority of this defendant to construct this bridge was complete before the amendment. If we are right in holding that Congress has authorized the construction of this bridge and that the details of its construction are matters entirely within the Federal jurisdiction, then clearly the effect of this amendment is to nullify the will of Congress, because it places regulations on the construction of the bridge absolutely inconsistent with the plans and specifications approved by the Secretary of War, and we think that if the Legislature cannot thus nullify the will of Congress neither can it penalize its corporation for engaging in a lawful enterprise and an enterprise in which it could unquestionably lawfully engage except for this unlawful legislation by the State. In other words, the State cannot pass an unlawful act and solely on the strength

thereof restrain a corporation from doing that which it has a right to do. If we are correct in holding that the amendment of 1918 cannot be sustained as an exercise of police power or as a regulation of navigation we know of no other reason which justifies a legislative mandate restraining the defendant. The only effect of the amendment is to obstruct and interfere with the interstate commerce development of the country.

For the reasons heretofore stated as well as for the reasons assigned in the opinion at Special Term we conclude that the jurisdiction of the Federal government is paramount and exclusive, and that the State Legislature is powerless to prevent the construction of the proposed bridge by the defendant.

The judgment and order should be affirmed, with costs.

All concurred, except JOHN M. KELLOGG, P. J., dissenting.

Judgment and order affirmed, with costs.