**SOUTHERN RAILWAY COMPANY**
v.
**TENNESSEE VALLEY AUTHORITY.**

Civ. A. No. 4660.

United States District Court
E. D. Tennessee, N. D.

Oct. 2, 1963.

Findings of Fact and Conclusions of
Law Oct. 23, 1963.

Clyde W. Key, Knoxville, Tenn., for plaintiff.

Charles J. McCarthy, Thomas A. Pedersen, M. G. Forster, Knoxville, Tenn., for defendant.

ROBERT L. TAYLOR, Chief Judge.

This action was instituted by the Southern Railway Company to have its rights declared under Title 16 U.S.C. § 831c, with respect to certain expenditures made and probably to be made in connection with what has been referred to in this record as the Clinch River railroad bridge at Clinton, Tennessee.

This bridge was constructed by the Southern or its predecessors in 1903 or 1904 and has been in existence in part at least ever since that date. In 1957 a certain portion of the bridge was severely damaged by a train derailment which necessitated some major repairs. The portion of the bridge that was rebuilt or repaired is shown on Exhibit "G" in red. The photographer was looking downstream when this picture was taken. An examination of the map shows that a pier or an underpinning to the trestle of the bridge was installed in what at that time was the main navigation channel. The repairs including the obstruction in the main navigation channel were unnoticed by the TVA until it made a survey in preparation for construction of the Melton Hill Dam sometime in 1960. This obstruction came to the notice of the officials of the TVA, or to put it more precisely, to the TVA Committee for the Administration of Section 26a of the 1933 Tennessee Valley Authority Act which is carried in the Code as Title 16, Sec. 831y–1. This section of the Act provides, in substance, that before a construction may be commenced on the Tennessee River, approval for such construction must be obtained from the TVA. Southern did not obtain this approval from the TVA before making the repairs to its damaged bridge.

Southern's explanation for failing to obtain permission is that it obtained approval from the Corps of Engineers and that this was the governmental agency that had handled the bridge construction over navigable streams in the past and it felt that such approval was sufficient.

On receiving notice of the obstruction, TVA, through its proper representative, Mr. Reed Elliott, notified Southern that it had installed an obstruction that interfered with the navigation channel of the Clinch River and that it would be necessary to remove such obstruction or to do what was necessary to open the channel. In due course the TVA and Southern worked out a plan whereby the navigation channel on the river would be changed so as to place it between the piers in the left channel looking downstream and also shown on Exhibit "G". The plans are listed on Exhibit "E".

During the negotiations the question arose as to whether TVA should reimburse the Southern for certain items of cost for the additional work done on the bridge and under the bridge in order to have a sufficient channel for navigation. The Southern took the position that it should be reimbursed and TVA took the position that it was not obligated legally or morally to reimburse Southern for the costs incurred on any of the items.

Southern recognized the fact, if it is a fact, that it was to do the work neces-

sary to be done in order to make the channel under the bridge navigable but reserved its rights to appeal to the Court for reimbursement for certain items of work done under what has been referred to in this record as the "Bridge Act."

The items involved about which the witnesses have testified in some detail and which have been explained by counsel in their respective opening statements, are substantially as follows:

Installation of navigation lights on the bridge or under the bridge or on one or more piers of the bridge as required by Coast Guard regulations. The estimated cost of this item is $1,500.00 as capital investment and $35.00 per month for maintenance. Southern contends that the purpose of the lights is to protect the bridge and to make navigation safe. Southern further contends that under the case that it had with the TVA in one of the southern states and which was finally decided by the Fifth Circuit Court of Appeals and reported in 294 F.2d 491, that the TVA is legally obligated to reimburse it for this item because its purpose in part is to protect the bridge.

We do not agree. Counsel has stated in the course of this hearing, although their statements were not in the form of testimony, that since its birth in 1933 TVA has not borne the expense of any lights on any of the railroad bridges over the Tennessee River. Although this fact may not be conclusive, it indicates that the light item has not been recognized by anyone as an item of expense to the TVA.

Some question arose during the testimony as to whether these lights were being installed at the instance of the TVA as a part of its policy, and counsel for TVA replied that they were not, and that if the Coast Guard did not require their installation TVA would not demand installation.

In view of this situation, the order made in this Court will show that TVA does not insist upon the installation of these lights and that unless the Coast Guard requires their installation then the Southern will not be required to install them.

The second item involves what has been described in this record as the steel bent. The Court did not understand what was meant by the steel bent until either Mr. Taylor or Mr. Elliott pointed it out on Exhibit "Q". This is the part of the bridge that counsel for TVA has referred to as the unlawful obstruction put in the river by Southern without authorization from the TVA.

As indicated it is shown plainly in Exhibit "Q" while looking downstream. The water as raised by the dam covers about two feet or more of the steel bent and unless the steel is encased by concrete or some other substance it will rust and deteriorate. The cost of this item would have been approximately $6,100.00 if the work had been done before the water level was raised. Southern contends that it will cost some $11,000.00 at the present time.

The Court does not reach a decision on this item. It requests briefs from each side in support of their respective contentions.

The third item involves cost for fenders on the piers that support the bridge and which are shown in the various pictures that have been filed in the record. The estimated cost of these fenders exceeds $100,000.00. All of the proof shows that these fenders are not needed at the present time. The other bridges of Southern, over the Tennessee River, and there are five in number which it owns, plus an additional one owned by the L & N Railroad, are operated without fenders.

The proof is to the effect that the traffic over the Tenessee River is of course much heavier than that over the Clinch River. The Court without proof could probably take judicial knowledge of this fact but in light of the overwhelming proof on the question it is not necessary to take judicial knowledge.

Southern contends that the traffic may necessitate fenders at some future date. According to the proof this date is not

foreseeable, and the item involves too much conjecture and speculation for the Court to order the TVA to reimburse Southern for anything under this item.

The fourth and final item involves what Southern claims as an expense necessary to make repairs to the bridge while it is under water. In a word, Southern says that repairs will be necessary in the future and it will be more expensive because the Melton Hill Dam has raised the water level to a point where the workmen who make the repairs will have to make them under water.

It appears to the Court that this item also involves speculation and conjecture, but the Court will not rule on it with finality until briefs are received from each side.

In sum, the Court holds and finds that Southern is not entitled to be reimbursed on the light item, which has been referred to as item No. 1, or on the fender item, which has been designated as item No. 3.

The two items not disposed of in this memorandum will be briefed by the parties within 10 days from date.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This cause came on to be tried before the Court without a jury on September 24, 1963, and was submitted for final judgment upon the pleadings, proof, briefs, and arguments of counsel, from all of which the Court makes the following determinations:

### Findings of Fact

1. Prior to May 25, 1957, the Southern Railway Company (hereinafter called "Southern") owned and maintained a railroad bridge across the Clinch River at Clinton, Tennessee, which provided adequate clearances for both navigation and flood control. The Clinch River at this location is a tributary of the Tennessee River and is a part of the navigable waterways of the United States under the jurisdiction of the Tennessee Valley Authority (hereinafter called "TVA").

2. Prior to May 25, 1957, the portion of Southern's bridge located between the banks of the river consisted of two steel truss spans which were supported by a center pier located approximately in the middle of the stream and a pier on each bank of the river. The effective horizontal clearance (measured perpendicular to the sailing lines) for commercial navigation through the span connecting the right bank (looking downstream) with the center pier was approximately 120 feet with the river in its natural state. The effective horizontal clearance for commercial navigation through the span connecting the left bank of the river with the center pier was approximately 75 feet with the river in its natural state. Prior to 1957 the elevation of the low steel in the spans of the bridge was 829.1 feet above MSL.

3. On or about May 25, 1957, a portion of this bridge was damaged or destroyed by the derailment of one of plaintiff's trains. Thereafter, without obtaining approval from the Board of Directors of TVA under the provisions of section 26a of the Tennessee Valley Authority Act of 1933, as amended (16 U.S.C. § 831y-1 (1958)), Southern undertook to rebuild the right span (looking downstream) of the bridge and in so doing reduced both the horizontal and vertical clearances over the navigable portion of the stream in the following respects: The rebuilt span was supported at one end by the original pier on the right bank of the river and on the other end by the original center pier in the stream, and was also supported in the middle by a new concrete pedestal and supporting steel bent built in the middle of the navigation channel of the river. The horizontal clearance between the pier on the right bank and the new concrete pedestal is now less than 50 feet; and the elevation of the low steel across that portion of the stream is at elevation 827.1 feet above MSL, whereas it was formerly 830.1 feet above MSL. The horizontal clearance between the center pier and the new concrete pedestal is now less than 90 feet; and the elevation of the low steel across this portion of the span is 824.0 feet MSL, whereas it was formerly 829.5

feet above MSL. The horizontal and vertical clearances under the span of the bridge between the left bank and the center pier remained unchanged.

4. Section 26a of the TVA Act provides in substance that the "unified development and regulation of the Tennessee River system requires that no dam, appurtenant works, or other obstruction, affecting navigation, flood control," shall be constructed or maintained across or along the Tennessee River or any of its tributaries until the plans therefor have been submitted to and approved by the TVA Board of Directors and that the construction, operation, or maintenance of such structures without such approval is prohibited. The TVA regulations pertaining to the securing of such approval were published in the Federal Register in 1946 (18 C.F.R. § 301.2 (1961)) and were a matter of public knowledge at the time Southern made the alterations to its bridge in 1957. Before the alterations were made to the bridge, Southern was notified by the Nashville District of the United States Corps of Engineers on March 22, 1957, that the TVA Act requires approval of TVA for bridges to be constructed across streams under its jurisdiction.

5. Pursuant to the general Bridge Act of 1946, the District Engineer, United States Corps of Engineers, Nashville District, issued a public notice on March 22, 1957, proposing to give the Corps advance approval to all bridges across the Clinch River above river mile 14.1, which would include Southern's bridge at Clinton, Tennessee. This notice stated that: "This advance approval by the Secretary of the Army will not affect the provisions of the Tennessee Valley Authority Act, which require approval of the Tennessee Valley Authority for bridges to be constructed across streams under its jurisdiction." There having been no objection or protest in response to the public notice, the Nashville District Engineer on August 20, 1957, issued a public notice stating that thereafter approval of the location and plans of bridges across the Clinch River above river mile 14.1 would

not be required by the Secretary of the Army and Chief of Engineers, but that such advance approval would not affect the requirements for approvals under the TVA Act.

6. Before the creation of TVA, the Corps of Engineers had studied the Tennessee River and its tributaries, and as early as 1930 had identified Melton Hill Dam site aross the Clinch River, approximately 23 miles above the mouth of the river, as a favorable location for a dam.

7. The TVA Act, as amended in 1935 (16 U.S.C. § 831c(j)), authorized TVA to construct such dams, and reservoirs, on the Tennessee River and its tributaries, as in conjunction with Wilson Dam, and Morris, Wheeler, and Pickwick Landing Dams, then under construction, would provide a nine-foot channel in the river and maintain a water supply for the same, and would best serve to promote navigation on the Tennessee River and its tributaries. In its report to Congress in 1936 on the unified development of the Tennessee River, TVA reported the feasibility of constructing a dam at the Melton Hill site, although it did not then recommend the construction of such a project.

8. From 1940 through 1942, and from 1948 through 1956, TVA expended $171,000 of the funds appropriated by Congress for the TVA program to study intensively and in detail the construction of such a dam and lock at the Melton Hill site. By 1954 TVA concluded that Melton Hill Dam should be built with a reservoir having a maximum elevation of 795 feet above MSL. One of the reasons for selecting this elevation was that no adjustments would be required for bridges then existing across the reservoir, including the Southern's bridge, which as then constructed provided acceptable clearances through the span between the right bank and the center pier. Such a reservoir would provide a navigable channel extending above the plaintiff's bridge to an assured depth of 11 feet.

9. In 1957 TVA requested funds for the construction of the Melton Hill proj-

ect and the Congress in September 1958, and again in 1959, specifically appropriated funds for the continued design of the project. In September 1960 Congress appropriated funds for the beginning of construction of the project and has since appropriated funds for the completion of the project.

10. The TVA Melton Hill project impounds water in the Clinch River to elevation 795 feet above MSL. TVA will fluctuate the reservoir between elevation 790 and 795 feet above MSL, and provide a navigable channel extending above the Southern bridge at Clinton of an assured depth of 11 feet.

11. The lock at Melton Hill Dam has inside dimensions of 75 feet by 400 feet, and was designed to accommodate the simultaneous lockage of four jumbo barges which are 35 feet in width and 195 feet in length, or three such barges and one tow boat. These are the standard barges used on the Tennessee River. The navigable channel has a width of 200 feet, except at three bridges where the horizontal clearances are less than 200 feet.

12. On March 16, 1961, TVA notified Southern that the 1957 alteration of its bridge comprised an unlawful interference with navigation and that it had not been approved by the TVA Board of Directors in accordance with the provisions of section 26a of the TVA Act.

13. Following discussions between the TVA staff and Southern representatives during the summer and fall of 1961, Southern developed a plan for the restoration of satisfactory clearances under the bridge as altered in 1957. TVA officials stated that they would recommend approval of the plan by the TVA Board of Directors only if Southern paid the cost of such work. This plan involved the necessary excavation to allow diversion of the navigation channel from under the right span of the bridge (looking downstream) to under the left span of the bridge; the concrete encasement of the steel bent which Southern constructed in the navigation channel in 1957; and the installation of navigation lights on the new navigation span under which the excavation was to take place.

14. Southern filed its application for the approval of such plans with TVA's Committee for the Administration of Section 26a on December 15, 1961.

15. On December 21, 1961, Southern requested TVA (1) to bear the expense of adding fenders to protect piers, (2) to agree to draw down the reservoir when repairs may be required, and (3) to pay for the navigation light and steel bent protective encasement proposed under Southern's plans for which approval was requested December 15, 1961. On February 5, 1962, TVA refused to assume such obligation.

16. On February 8, 1962, the TVA Board of Directors approved Southern's plans. The TVA approval specified that Southern was to "pursue with diligence the work described at its sole cost and expense" and to complete the work by a specified date, reserving to Southern any rights it may have under the act of November 21, 1941 (16 U.S.C. § 831c-1 (1958)), hereinafter called the "TVA Bridge Act."

17. Southern, on April 6, 1962, asked TVA to clarify the problem of the cost of installing the navigation light by interpreting the approval of plans as being subject to future litigation under the TVA Bridge Act concerning the cost of installing such light. On April 13, 1962, TVA replied to Southern's April 6 request, denying that Southern had any rights under the provisions of the TVA Bridge Act and stating that Southern should either restore the clearances in accordance with the plans as approved or that it should remove the 1957 obstruction and rebuild the span as it existed before 1957. On April 23, 1962, Southern accepted TVA's approval of plans of February 8, 1962.

18. Southern has completed the excavation, and spreading and disposing of spoil therefrom, in accordance with the approved plans, but has not encased the steel bent with concrete nor installed the navigation light as indicated on its plans. By excavating the left bank an effective

horizontal clearance of approximately 120 feet has been provided between the pier in the center of the river and the pier on the left bank, and a minimum vertical clearance of 34.5 feet above full pool is provided under the span. TVA has re-routed the navigation channel through this span.

19. Southern's bridge in its original condition prior to the alterations in 1957 was adequate to meet the needs of navigation and flood control. This bridge as then constructed would not have been endangered or otherwise adversely affected or damaged by the construction of Melton Hill Dam and Reservoir within the meaning of the TVA Bridge Act, and no alterations would have been required as a result of the construction of Melton Hill Dam and Reservoir.

20. Southern's alteration of the bridge in 1957 and the erection of the concrete pedestal and steel bent in the navigation channel of the river constituted an obstruction to navigation within the meaning of section 26a of the TVA Act.

21. TVA did not discover Southern's alteration of the bridge until the fall of 1960 when it began a detailed inspection of the reservoir prior to commencement of the construction of Melton Hill Dam.

22. The construction of Melton Hill Dam and Reservoir will not necessitate the installation of fenders or other similar protective devices to Southern's bridge.

23. On or about September 23, 1963, the plaintiff received from the United States Coast Guard a letter advising in substance that the plaintiff's bridge involved in this suit is now considered in need of lighting for the safety of navigation, and requiring plaintiff to install, maintain and operate navigation lights on said bridge at its own expense, commencing by "next Spring."

### Conclusions of Law

1. This Court has jurisdiction over the parties and subject matters of the complaint and counterclaim. TVA Act, § 26a (16 U.S.C. § 831y–1 (1958)); TVA Bridge Act (16 U.S.C. § 831c–1 (1958)).

2. Congress has plenary power over the navigable waters of the United States. United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed. 2d 903 (1960); United States v. Chicago, M., St. P. & P. R. R., 312 U.S. 592, 61 S.Ct. 772, 85 L.Ed. 1064 (1941); Arizona v. California, 283 U.S. 423, 51 S.Ct. 522, 75 L.Ed. 1154 (1931); Scranton v. Wheeler, 179 U.S. 141, 21 S.Ct. 48, 45 L.Ed. 126 (1900); United States v. Ingram, 203 F.2d 91 (8th Cir.), cert. denied, 345 U.S. 995, 73 S.Ct. 1136, 97 L.Ed. 1402 (1953).

3. Congress has delegated to TVA the responsibility for determining the scope and character of navigation improvements on the Tennessee River and its tributaries, including the Clinch River. TVA Act § 4(j) (16 U.S.C. § 831c(j) (1958)).

4. The Clinch River at the site of plaintiff's bridge is a tributary of the Tennessee River system and was at all times pertinent hereto a navigable stream under the jurisdiction of TVA. TVA Act § 4(j) (16 U.S.C. § 831c(j) (1958)); United States ex rel. TVA v. Siotha Longmire, Civil No. 2799, E.D.Tenn., Aug. 23, 1935; United States ex rel. TVA v. David Hawkins, Civil No. 2800, E.D.Tenn., Aug. 23, 1935.

5. To assure the unified development and regulation of the Tennessee River system, Congress delegated to TVA the responsibility for approving all structures affecting navigation and flood control on the Tennessee River system, including the Clinch River, and made it unlawful to construct, operate, or maintain such structures without TVA approval. TVA Act § 26a (16 U.S.C. § 831y–1 (1958)).

6. TVA regulations under section 26a of the TVA Act have the force of law, and their publication in the Federal Register in 1946 (18 C.F.R. § 301.2 (1961)) gave notice to all concerned, including the plaintiff in this case. Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380,

68 S.Ct. 1, 92 L.Ed. 10 (1947); United States v. Hedburg, D.C., 217 F.Supp. 711 (1963); Roberts v. Federal Crop Ins. Corp., 158 F.Supp. 688 (E.D.Wash.1958).

7. The Southern Railway bridge as altered in 1957 without TVA approval constituted an unlawful obstruction to navigation which is prohibited by section 26a of the TVA Act.

8. The action of TVA in approving Southern's plans for the realteration of the bridge was a lawful and proper exercise of the powers vested in it by section 26a of the TVA Act.

■ 9. The TVA Bridge Act (16 U.S.C. § 831c–1 (1958)) does not authorize compensation or reimbursement to a bridge owner for any alterations to a bridge which are required to make the bridge a lawful structure under section 26a of the TVA Act; and therefore the Southern Railway is not entitled to be compensated or reimbursed for any expense incurred in making any of the alterations specified in the 26a permit approved in the present case.

■ 10. Congress has directed that owners of bridges over navigable waters of the United States shall maintain at their own expense such lighting as is prescribed by the Commandant of the Coast Guard. 33 U.S.C. § 494 (1958); 33 C.F.R. § 68.01–1 (1962).

■ 11. The compensation or reimbursement to a bridge owner authorized by the TVA Bridge Act is restricted to the reasonable actual cost of such protection, removal, alteration, replacement, or reconstruction as is required as a direct result of the construction of any dam, reservoir, or other improvement under the provisions of the TVA Act, and it does not include expenses incurred by the bridge owner for fenders or other protective devices which the bridge owner may add to protect the bridge against increased traffic on the river, and Southern will not be entitled to be compensated or reimbursed for the cost of such items.

■ 12. The TVA Bridge Act does not authorize compensation or reimbursement to a bridge owner for increased expenses for future maintenance or repairs, and Southern will not be entitled to be compensated or reimbursed for such items.

■ 13. The TVA Bridge Act does not permit the owner of a bridge who wrongfully alters it by reducing the navigation clearances to transfer to TVA the costs involved in restoring adequate navigation clearances.

14. Southern is not entitled to any relief under the TVA Bridge Act.

15. Southern will be ordered to perform, at its own expense, the work and alterations specified in the section 26a approval filed as Exhibit 1 to the answer and counterclaim of TVA, or in the alternative to restore the navigation clearances as they existed prior to May 25, 1957.