**TENNESSEE VALLEY AUTHORITY,**
Plaintiff,

v.

**SOUTHERN RAILWAY COMPANY**
et al., Defendants.

Civ. A. No. 1080.

United States District Court
N. D. Alabama,
Northwestern Division.

July 29, 1966.

Charles J. McCarthy, Gen. Counsel, Thomas A. Pedersen, Asst. Gen. Counsel, Herbert S. Sanger, Jr., and M. G. Forster, Attys., TVA, for plaintiff.

Mitchell, Poellnitz, Cox, Robison & McBurney, Florence, Ala., and Cabaniss, Johnston, Gardner & Clark, and George Maynard, Birmingham, Ala., for Southern Ry. Co.

Almon & McAlister, Sheffield, Ala., and Marvin D. Jones, Louisville, Ky., for L. & N. R. Co.

LYNNE, Chief Judge.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This cause came on to be tried before the court without a jury on April 29, May 31, June 1, and June 2, 1966, and was submitted for final judgment on the pleadings, proof, and arguments of counsel, on the limited issue as to the direct and special benefits accruing to defendants as a result of alterations to the Southern Railway bridge as stated in the pretrial order entered March 1, 1966; from all of which the court makes and

enters the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. The Southern Railway Company (Southern) has owned and maintained a railroad bridge across the Tennessee River at Florence, Alabama, for a great many years. Pursuant to the judgment entered herein on May 6, 1960, as affirmed by the Court of Appeals for the Fifth Circuit (294 F.2d 491 (1961)), the Tennessee Valley Authority was authorized and directed to make certain alterations and modifications to a portion of the bridge to preserve its safety and utility and to meet the requirements of navigation.

2. The bridge is approximately 2,577 feet long, and prior to its alteration consisted of 12 deck plate girder spans, 15 double-deck fixed truss spans, 1 double-deck through truss swing span, all supported on stone masonry and concrete piers and abutments. The upper deck is used for a single-track railroad. The lower deck was arranged for highway traffic and was so used until a new highway bridge was constructed immediately downstream from the old bridge about 1940.

3. The project for altering the bridge included the realignment, widening, and deepening of the navigation channel under the bridge to increase the horizontal clearance to 350 feet (measured perpendicular to the channel) and to provide vertical clearance to elevation 476 feet above mean sea level. The alterations did not change the overall length of the bridge, and affected only approximately 505 feet located over and adjacent to the navigation canal. The following parts were removed and replaced:

One 62′6″ double-deck truss span (erected 1906)

The 412′ double-deck through truss swing span (erected 1890) with machinery and machinery house (erected 1906)

Part of one 44′ deck plate girder span (erected 1894)

One steel bent which supported the south end of the 44′ girder span (erected 1894)

Tract, timber deck, special rail joints on spans removed, wire lines, a timber building, and other miscellaneous items

One sandstone masonry pier (Pier A, erected 1840) which supported the south end of the 62′6″ truss span

One sandstone masonry pier (Pier B, erected 1890) which supported the north end of the 62′6″ truss span and the south end of the swing span

One circular sandstone masonry pivot pier which supported the center of the 412′ swing span (erected 1890)

Part of the sandstone masonry abutment (erected 1840) and its concrete encasement (added in 1937) which supported the north end of the 412′ swing span and the south end of the 44′ girder span

4. The wrought-iron and steel framework of the super-structure which was removed showed evidence of age in the form of rust, corrosion, and pitting. A crack had developed in a hip joint on the downstream truss of the swing span which was caused either by excessive and prolonged stress or metal fatigue from repeated operations of opening and closing the bridge to river traffic. The machinery and electrical controls were also old, worn, deteriorated and obsolete. Much of the substructure was also in bad condition. Pier A was splitting vertically, was held together with timbers and steel rods, and had only a tapered shaft with no spread footings to distribute the load. The foundation of this pier was unstable. It was sitting on sand and gravel and the underlying rock was honeycombed with numerous seams and cavities. Pier B also consisted of a tapered shaft with no spread footings, and it was underlaid with seams, cavities, and mud for a depth of 15 feet. The north abutment, constructed of sandstone masonry with concrete encasement, had many loose joints and was sitting on an unstable foundation of sand, gravel, and mud for a depth of about 11 feet

above bedrock. Operations over the bridge were restricted by load and speed limitations imposed by Southern.

5. New parts installed to replace the parts removed are as follows:

Four reinforced concrete piers

Two 43′3″ steel tower spans with new timber decks

One 406′ through truss vertical lift span with new timber deck and special rail joints, all complete with operating and signal equipment

The designed carrying capacity of the bridge was not increased.

6. TVA was given responsibility for doing all things necessary to complete the bridge alterations in accordance with the plans and specifications on file herein, and in carrying out that responsibility TVA contracted part of the work and performed part of the work with its own forces. The alteration work was begun on May 2, 1961. The bridge was closed to traffic on September 8, 1961, and reopened to traffic on September 20, 1962.

7. The TVA Bridge Act provides in pertinent part that in the event of such alterations the bridge owner (Southern) "shall be charged with a sum which shall equal the net value to the owner of any direct and special benefits accruing to the owner from any improvement or addition or betterment of the altered, reconstructed, relocated, or replaced bridge, trestle, or structure" (16 U.S.C. § 831c–1 (1964)). The Truman-Hobbs Act provides:

The bridge owner shall bear such part of the cost as is attributable to the direct and special benefits which will accrue to the bridge owner as a result of the alteration, including the expectable savings in repair or maintenance costs; and that part of the cost attributable to the requirements of traffic by railroad or highway, or both, including any expenditure for increased carrying capacity of the bridge, and including such proportion of the actual capital cost of the old bridge or of such part of the old bridge as may be altered or changed or rebuilt, as the used service life of the whole or a part, as the case may be, bears to the total estimated service life of the whole or such part: *Provided,* That in the event the alteration or relocation of any bridge may be desirable for the reason that the bridge unreasonably obstructs navigation, but also for some other reason, the Secretary may require equitable contribution from any interested person, firm, association, corporation, municipality, county, or State desiring such alteration or relocation for such other reason, as a condition precedent to the making of an order for such alteration or relocation. The United States shall bear the balance of the cost, including that part attributable to the necessities of navigation [33 U.S.C. § 516 (1964)].

8. Regulation No. 1145–2–310 issued January 15, 1964, by the Office of the Chief of Engineers, Department of the Army, the agency designated to administer the Truman-Hobbs Act, sets forth the guidelines and principles for the apportionment of costs under that act. To the extent applicable, the court has adopted the Truman-Hobbs formula and the Corps of Engineers' regulations promulgated thereunder in arriving at the net value to Southern of the direct and special benefits accruing to Southern from the bridge alterations under the TVA Act. The court also finds that an interest rate of three and one-half per cent (3½%) compounded annually, as recommended by the Corps of Engineers' regulations published in 1964, is a fair and reasonable rate for capitalization and amortization purposes in the present case.

9. The bridge alterations were satisfactorily completed at a total cost to TVA of $3,024,082 of which $3,006,222 is to be apportioned between TVA and Southern Railway. The court finds that the L & N Railway is not a "bridge owner" within the meaning of the law. The

direct and special benefits accruing to Southern from these alterations and improvements, and the costs to be borne by Southern therefor, are as follows:

| | |
|---|---:|
| Removal of old bridge | $ 35,700 |
| Fixed charges (engineering, etc.) | 12,000 |
| Expectable savings in repairs and maintenance costs | 12,950 |
| Expired service life of old bridge | 74,900 |
| Costs to be borne by Southern | 135,550 |
| Costs to be borne by TVA | 2,870,672 |
| TOTAL | $3,006,222 |

———◆———

These amounts are computed as shown hereinafter.

10. Southern's share ($35,700) of removing parts of the old bridge is derived as follows:

| Item Removed | Age in 1961 | Owner's Share (Per Cent) | Removal Costs | Owner's Share of Removal | Years Remaining. | Present Worth Factor Compounded Annually | Owner's Present Liability |
|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| Pier A | 121 | 96.80 | $ 3,000 | $ 2,904 | 4 | 0.8714 | $ 2,550 |
| Pier B and Pivot Pier | 71 | 71 | 14,840 | 10,536 | 29 | 0.3687 | 3,900 |
| N. Abut.- Masonry | 121 | 96.80 | 2,780 | 2,691 | 4 | 0.8714 | 2,350 |
| Concrete | 24 | 24 | 2,220 | 535 | 76 | 0.0732 | 50 |
| 62′ 6″ Truss | 55 | 73 | 2,106 | 1,537 | 20 | 0.5026 | 750 |
| 412′ Swing Span, Machinery & House | 71 | 95 | 29,557 | 28,079 | 4 | 0.8714 | 24,450 |
| Part of 44′ Span | 67 | 89 | 259 | 231 | 8 | 0.7594 | 200 |
| Remove and Relocate Buildings | – | 50 | 800 | 400 | 17 | 0.5572 | 200 |
| Power Lines, Interlockers & Communication Lines | 18 | 50 | 110 | 55 | 17 | 0.5572 | 50 |
| Rail and Joints | 60 | 50 | 2,423 | 1,211 | 25 | 0.4231 | 500 |
| Timber Decks 17–14–12 | | 50 | 2,200 | 1,100 | 12½ | 0.6481 | 700 |
| TOTALS | | | $60,295 | $49,279 | | | $35,700 |

11. Southern's share ($12,000) of the fixed charges is derived as follows: The total design and construction engineering costs of the alteration, without overhead, were $246,196. The court is of the opinion that 8 per cent of that amount, or $19,696, is a reasonable amount to be added for administrative overhead costs, making the total fixed charges to be apportioned $265,892. The share of the bridge owner is computed as that part of the fixed charges that the cost attributable to the bridge owner, excluding fixed charges, bears to the total cost of the alteration to be apportioned, excluding fixed charges.

12. Southern's share ($12,950) of the alteration costs resulting from expectable savings in repair and maintenance costs is derived as follows:

(a) Timber deck .......... $5,800
Closer spacing of the beams and girders in the new structure resulted in the use of smaller and shorter crossties and relocation of the walkway resulted in further economy in timber, thereby reducing replacement costs. Using a unit price of $320 per MBM for replacing the old timber deck in kind, a unit price of $300 per MBM for replacing the new deck, a service life of 25 years, and 3½ per cent interest compounded annually, the annual savings is computed as follows:

| | |
|---|---:|
| Annual charge replacing old deck 55 MBM x 320 x .02567= | 452 |
| Annual charge replacing new deck 32.332 MBM x 300 x .02567= | 249 |
| Total annual savings | $203 |

Annual savings capitalized at $3\frac{1}{2}\% = \dfrac{203}{.035} =$ $5,800

(b) Other maintenance and painting .................. $7,150

The court finds that the maintenance charges for the old bridge averaged about $2,474 annually, and that over the life of the new bridge maintenance charges will average about $2,223 annually, resulting in an average annual savings in maintenance of $251.

Total annual savings capitalized at $3\frac{1}{2}\% = \dfrac{251}{.035} =$ $7,150

13.   Southern's portion ($74,900) of the alteration costs due to the expired service life of the parts of the old bridge which were removed is computed as follows:

| Items Removed (1) | Year Built (2) | Original Cost (3) | Salvage Value (4) | Actual Capital Cost (5) | Est. Service Life (6) | Expired Service Life Yrs. | Expired Service Life Per Cent of Total (7) | Value of Expired Service Life (to nearest $50) (8) |
|---|---|---|---|---|---|---|---|---|
| Pier A | 1840 | $ 3,128 | $ – | $ 3,128 | 125 | 121 | 0.9680 | $ 3,050 |
| Pier B and Pivot Pier | 1890 | 15,380 | – | 15,380 | 100 | 71 | 0.7100 | 10,900 |
| N. Abut. – Masonry | 1840 | 2,856 | – | 2,856 | 125 | 121 | 0.9680 | 2,750 |
| Concrete | 1937 | 2,280 | – | 2,280 | 100 | 24 | 0.2400 | 550 |
| 62′ 6″ Truss | 1906 | 5,941 | 1,679 | 4,262 | 75 | 55 | 0.7333 | 3,100 |
| 412′ Swing Span, Machinery & House | 1890 | 66,740 | 14,983 | 51,757 | 75 | 71 | 0.9467 | 49,000 |
| Part 44′ Span | 1894 | 408 | 116 | 292 | 75 | 67 | 0.8933 | 250 |
| Power Lines | 1943 | 750 | – | 750 | 34 | 17 | 0.5000 | 400 |
| Interlockers | 1946 | 2,197 | 402 | 1,795 | 34 | 15 | 0.4412 | 800 |
| Communication Lines | – | 500 | – | 500 | 34 | 17 | 0.5000 | 250 |
| Timber Deck | 1944–47–49 | 7,032 | 680 | 6,352 | 25 | 12½ | 0.5000 | 3,200 |
| Special Rail Joints | 1911 | 500 | – | 500 | 75 | 50 | 0.6666 | 350 |
| Tool House | – | 600 | – | 600 | 34 | 17 | 0.5000 | 300 |
| TOTALS | | $108,312 | $17,860 | $90,452 | | | | $74,900 |

14.   TVA's claim for "equitable contribution" under section 6 of the Truman-Hobbs Act, based on the ground that the old bridge was obsolete and unsafe and that it was therefore "desirable" that the bridge be altered for some other reason than that it constituted an unreasonable obstruction to navigation, is not allowed. Under the statute "equitable contribution" may be required only from

those "desiring such alteration." Since Southern opposed the alteration, it did not "desire" the alteration within the meaning of the statute, and, therefore, such contribution cannot be ordered.

15. While there may be savings to Southern in operating costs of the new bridge, the court is of the opinion that any such savings are not a proper item to be considered under the Truman-Hobbs Act.

16. TVA's claim that the elimination of the pivot pier and widening of the navigation channel results in substantial savings in repair and maintenance costs which should be considered as a direct and special benefit under the law is not allowed because the court is of the opinion that these benefits result from alterations made solely in aid of navigation and therefore are not proper items to consider under the Truman-Hobbs Act and the regulations of the Corps of Engineers promulgated thereunder.

17. TVA is entitled to 6 per cent interest on the total cost of $135,550.00 to be borne by Southern from September 20, 1962, the date the bridge was opened to railroad traffic, until July 29, 1966, which interest amounts to $31,351.16.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties and subject matter of the complaint (TVA Act, 16 U.S.C. § 831c–1 (1964)).

■ 2. The statutory definition of direct and special benefits contained in the Truman-Hobbs Act is imported into the TVA Bridge Act. Hearings on S. 3610 Before a Sub-committee of the Senate Committee on Agriculture and Forestry, 76th Cong., 3d Sess. 10, 18 (1940); Hearings on H.R. 2097 Before the House Committee on Military Affairs, 77th Cong., 1st Sess. 5 (1941).

■ 3. The regulations issued by the Office of the Chief of Engineers, Department of the Army, the agency designated to administer the Truman-Hobbs Act, set forth the guidelines and principles for the apportionment of costs under that act, and have the force of law. Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); Southern Ry. v. Tennessee Valley Authority, 223 F.Supp. 1 (E.D.Tenn.1963); United States v. Hedburg, 217 F.Supp. 711 (D.S.D.1963); Roberts v. Federal Crop Ins. Corp., 158 F.Supp. 688 (E.D. Wash.1958).

■ 4. Operating costs are not a proper item to consider in apportioning costs under the Truman-Hobbs Act; accordingly, any reduced operating costs resulting from the alteration may not be chargeable to the bridge owner's share of the construction costs (App. I, Corps of Engineers Regulation No. 1145–2– 310).

[4] 5. Expectable savings resulting from the elimination of the pivot pier is not a direct and special benefit chargeable to Southern because the elimination of the pivot pier was solely for navigation purposes.

6. Louisville and Nashville Railroad Company, intervener herein, is not a "bridge owner" within the meaning of the law. Its claim for damages by reason of interruption of traffic, disruption of service, and attendant costs for rerouting of traffic, are not compensable under the law and are, therefore, denied.

■ 7. The direct and special benefits accruing to Southern from the alterations and improvements of the bridge, and the costs to be borne by Southern therefor, are as follows:

| | |
|---|---:|
| Removal of old bridge | $ 35,700 |
| Fixed charges (engineering, etc.) | 12,000 |
| Expectable savings in repairs and maintenance costs | 12,950 |
| Expired service life of old bridge | 74,900 |
| Costs to be borne by Southern | 135.550 |
| Costs to be borne by TVA | 2,870,672 |
| TOTAL | $3,006,222 |

8. The Tennessee Valley Authority is entitled to 6 per cent interest on the total cost of $135,550 to be borne by Southern from September 20, 1962, the date the bridge was opened to traffic, until July 29, 1966, which interest amounts to $31,351.16.

9. The Tennessee Valley Authority is entitled to a judgment against Southern in the amount of $166,901.16.

10. Each party will be required to bear its own costs and expenses of the case.